Carol T. MARGOLIN, Respondent,

v.

James S. MARGOLIN, Appellant.

Nos. WD 41787, 42325.

Missouri Court of Appeals,
Western District.

Aug. 7, 1990.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 2, 1990.

Jack Cochran, Blue Springs, for appellant.

Spencer J. Brown, Deacy & Deacy, Kansas City, for respondent.

Before KENNEDY, P.J., and SHANGLER and TURNAGE, JJ.

SHANGLER, Judge.

The marriage of James Margolin and Carol Margolin was dissolved on November 17, 1983. The decree of dissolution was in accordance with the terms of the separation agreement of the parties. It granted sole custody of the two boys, Daniel [born July 24, 1974] and Andrew [born August 6, 1976] to the mother, and provided for visitation with the father. The decree ordered the husband to pay the wife $2300 per month as maintenance until December 1, 1991, and $1000 per month [$500 per child] as support money.

On January 27, 1987, the husband moved to modify the decree to award joint legal and physical custody of the children to the husband and wife, or alternatively, for increased visitation rights with the children. Other components of the pleading sought an order to compel psychiatric counseling, therapy and evaluation for the children, and for the parents as well. The wife made response, and a year later, moved separately to modify the decree of dissolution to increase the award of child support, and for an order that the husband pay the tuition costs of the children at Pembroke Hill School. The motion of each, husband and wife, sought an award for an attorney fee against the other.

Hearing on the motions commenced on December 1, 1988, and progressed discontinuously until July 3, 1989, when the court denied the motion of the father for joint custody of the two sons. That interval was punctuated by suspensions of the proceedings to enable the court to respond to certain trial exigencies. In the course of her testimony on the second day of the hearing, the mother testified that the father had abused the children. The court promptly adjourned the proceedings and appointed a guardian ad litem for the boys Andrew and Daniel with directions to investigate the allegations and to render a report. The court ordered also that pending the report the parents have joint legal custody of both children and that the father have unrestricted rights of visitation with the boys during the daylight hours.

The guardian ad litem, Sonja M. Matson, Esq., presented her report on December 28, 1988. The text and tenor of that commentary evidence a competent and responsible discharge of professional duty.

The guardian ad litem reported, first, that the allegations of physical abuse of the boys by the father were stale and without sequel—and so should not bear on any arrangement for visitation by the father. There were more serious concerns. Andrew, then twelve years of age, professed to hate the father, considered him a liar and manipulator, and told the guardian ad litem that he would run away rather than be compelled to visit him. The difficulty that beset them was simply that Andrew and the father were unable to communicate effectively with each other. The guardian ad litem doubted the appropriateness of visitation between Andrew and the father at all at that time. It would subserve the best interest of the child, the report commented, for Andrew to counsel with a psychologist and to have the benefit of the evaluation of that expert before the court imposed on that child a regimen of visitation with the father. Margolin acknowledged to the guardian ad litem that he and Andrew would benefit from such therapy, but insisted nevertheless that Andrew be made to submit to visitation.

It was the interim order of unrestricted right of the father to have visitation with the sons, recently decreed by the court [the report continued], that had placed "[t]he entire family ... in constant uproar." The father insisted on the right of visitation, whether the boys agreed or not. Daniel [then 14 years of age] was usually amenable, but Andrew refused, and the father blamed the mother for not compelling the visits.

In summary, the guardian ad litem recommended in the best interest of the children that the court delineate a very precise schedule of visitation and that Andrew be exempted from the visitation schedule until the treating psychologist deemed it appropriate for visitation to resume.

The court accordingly entered a modified interim order that allowed the father visitation with both children for several hours on New Year's Day of 1989, and for any other occasions agreeable between father and children until January 6, 1989, when the hearing of evidence was to resume.

On that day the mother took up the testimony interrupted by the appointment of the guardian ad litem. The judge interviewed the children in chambers and then informed the parents he was not yet ready to issue "intrusive orders," but would allow them another opportunity to govern their own affairs. He invited each of them to prepare a writing as to how they might "get together and in a civil and rational manner, decide how [to] discuss the affairs of [the] children." The court formulated this hortation into an order, continued the hearing to January 23, 1989, and directed the parents then to present their written plan for "meaningful communication" between themselves and the boys.

On January 23, 1989, the proceedings resumed, and the litigants presented their "papers." The transcript shows only that the writings were marked as exhibits and made "part of the record." They do not appear in the record, however, and they are before us only as surmise. The guardian ad litem had no new report, and the session adjourned with a meeting between the judge and principals, off the record.

On February 10, 1989, on the basis of the evidence already presented, the court entered an order of modification of decree to increase the allowance of support for each child from $500 to $800 per month, retroactively to February 1, 1988. The increase represented the contribution by the father to the cost of tuition for the boys at Pembroke Hill School—a private academy—an expense until recently met by the paternal grandparents of the children. The court also ordered a $10,000 attorney fee in favor of the wife. These awards were granted on the separate motion for modification by the wife.

The decree also ordered that the mother remain the primary custodian as before, but modified the custody as to the son Daniel by a detailed schedule of visitation with the father that encompassed some one hundred days of significance annually. That order expressed that the schedule of visitation defined for Daniel "will not apply [to Andrew] unless and until Andrew has completed counseling with a qualified health-care professional and such professional finds that Andrew is able to perform the visitation." The order directed accordingly that Andrew receive counseling and that a report concerning the status of that treatment be presented to the court ninety days thereafter. That aspect of the decree concluded:

> At that time, the court will re-evaluate the situation between Andrew and his father. Until such time, Andrew is to have no overnight visitation with his father, but will have visitation with his father from 6:30 p.m. to 9:30 p.m. on Wednesday nights. The specific visitations herein ordered may be modified by agreement of the parties and the child.

The proceedings convened on July 3, 1989, specifically to receive any further proof on the motion by the father for joint custody of the boys. There was commentary by the respective counsel in response to the observation of the court: "Parents still not talking with each other, are they?" They reported that a bar mitzvah [presumably Andrew's] went off well through the mediation of the rabbi, but after that, the ability of the parents to communicate "de-teriorated almost immediately." It was evident from the colloquy that Daniel had accommodated to the visitation schedule but that Andrew and the father were at an impasse even as to the three-hour per week visitation the order of February 10, 1989, prescribed. The father attributed the predicament to the alienating intermeddling of the mother, and the mother to the resistance by the father to pay for the private school tuition for the boys.

There was also evidence presented at the July 3, 1989, proceeding. The guardian ad litem entered two reports submitted to her by the clinical psychologist to whom Andrew was referred under the auspices of the February 10 directive. The reports related that Andrew presented himself twice in the company of his mother, and that later the father was seen at his request to present his point of view—a perspective, the father felt, that was not represented during the sessions with Andrew. The psychologist described Andrew's plight as an involvement "in a sad and intense triangulation between the parents ... [a] tug of war over the soul of th[e] child." The report observed that the parents, "although physically divorced, remain enmeshed with each other and the children are caught in this conflictual triangle."

The examiner recommended that the objective of a sustained relationship between father and son commence modestly. The schedule the report advised was virtually that already in effect for Andrew: a weekly visit for three evening hours. It was a schedule the report recommended for practice over six months, and then an evaluation. It was an "absolute recommendation" that the parents participate in a therapy or mediation effort and that Andrew continue in therapy.

The guardian ad litem reported to the court that Andrew refused therapy as well as visitation. The guardian ad litem deemed the case not appropriate for an order of joint custody. She recommended that the order of visitation as to Andrew and the father remain in effect. The proceeding concluded. The final order denied

the motion of the father for joint custody and decreed that "the previous visitation order remain in full force and effect."

The husband appeals from orders in favor of the mother to increase his obligation for child support by $300 per child per month and for an attorney fee, and appeals separately from the denial of his motion for joint custody of the boys. The husband contends also that the order of visitation finally entered is too vague and uncertain for enforcement.

## I  CHILD SUPPORT

The original decree of dissolution entered on November 17, 1983, as provided by the separation agreement, awarded to the wife $2300 per month as maintenance and $500 per child per month for their support. The boys were then enrolled at Pembroke Hill School, a private preparatory academy, as they had been from a very early age. The paternal grandparents Margolin paid the tuition for the boys from the time of initial enrollment until the end of 1987. The maternal grandparents paid for the 1988 school year—$6898.90 for Andrew and $7018.75 for Daniel. The tuition for 1989 remained unpaid.

The motion of the mother sought an increase in child support of $275 per child per month, and in addition, for an order that the father pay the full cost of tuition for Daniel and Andrew for year 1988 and thereafter until graduation. The children were placed in Pembroke as a matter of course when they reached three years of age. The father, himself an alumnus of Pembroke, now favored their attendance at a public school. The increase entered by the court on the motion—$300 per child per month—was "for the express purpose of paying approximately one-half of the tuition of the two minor children at Pembroke Hill School for the 1988 school year and thereafter." The order made the mother responsible for the payment of the remainder of the tuition.

The order for the increase in child support rested on the express finding that the discontinuance of the tuition subsidy by the Margolin grandparents constituted a substantial change of circumstances. The designation of school was a reluctant decision by the court, a choice [the order noted] more aptly made by the parents but refused by them. Accordingly, the court found it in the best interests of the boys to remain at Pembroke "absent an agreement by the parties to the contrary."

The modification of a support decree is governed by § 452.370.1, RSMo.Supp.1990:

[T]he provisions of any decree respecting ... support may be modified only upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable....

The husband argues that the changed circumstances that precondition a modification of a support decree under the statute must be not only substantial and continuing, but also circumstances arisen since the decree was granted, and neither expected nor contemplated by the parties. These, he asserts, were not proven. It was known to them at the time of the separation agreement and decree—the argument goes—that the grandparents Margolin paid the tuition for the boys at the Pembroke school ever since each enrolled at the age of three, continued to pay the tuition at the time of the dissolution, and agreed to pay until the 1987 academic year, so that the discontinuance of that bounty was a circumstance neither newly arisen nor unexpected by them. Thus, concludes the husband, no change of circumstances was proven, and the modification of the support decree that assumes the premise was erroneous.

Whatever the validity of the propositions the argument tenders that, in addition to all else that § 452.370 imposes, there must also be proof that the circumstances invoked as the ground for modification were newly arisen since the decree and unexpected, the rationales of the cases cited do not bear relevantly on the evidence before the court. *Foster v. Foster*, 673 S.W.2d 108 (Mo.App.1984) and *Spaeth v. Spaeth*, 691 S.W.2d 494 (Mo.App.1985), argued to that effect by the father explain that the current version of § 452.370 imputes a purpose to discourage recurrent and insubstantial motions by a stricter standard for

modification than before. To advance the legislative policy, where only a short time elapsed between the motion to modify and the decree or prior modification of the decree, a court will require both allegation and proof "of some extraordinary change in circumstance," a change that is more than an "expected and predictable" sequel of the conditions that prompted the recent order or modification. *Foster* at 110[6]; *Spaeth* at 495. That rationale rests on the cognate premise that a predictable sequel is a factor already considered by the court in the formulation of the recent decree or modification. *In re Marriage of Cook*, 636 S.W.2d 419, 421[5,6] (Mo.App.1982).

In *Foster*, the lapse between the prior modification and subsequent motion was about fourteen months. In *Cook* it was less than one year, as it was in *Spaeth*. In *Spaeth* the request was not only for an allowance for the increased general expenses of the children, but also for past tuition due at a private high school for one of the children. In each case the increased expense was a predictable incident of conditions recently dealt with by the order of the court, and so was not the changed circumstance that would support a modification under § 452.370. In *Spaeth* also the order to pay the past high school tuition was as to a subject already known to the court at the time of the prior modification and, presumptively, reflected in that award.

The Margolin marriage was dissolved in late 1983 and the support award the wife seeks to modify was decreed then. That proceeding was brought more than four years later, and the change of circumstance the wife asserts as ground—the need to provide for private school instruction and tuition for the boys—was not a subject matter of the decree of dissolution. Nor was that circumstance even. in a term of separation agreement the decree rendered as a judgment. Thus, neither *Foster*, nor *Cook*, nor *Spaeth*, bear to add the stricture of an unexpected extraordinary circumstance the law imposes where the decree has only recently been modified.

The parties do not contest the fact, as found by the court, that the two boys attended the Pembroke school before the decree and were in attendance at the time of the hearing on the motion of the mother to modify the support award. The court also found that the parents both knew that the grandparents Margolin paid for the tuition for the boys at the school until the end of the 1987 school year. It was a matter of dispute, however, whether the wife knew that the grandparents would terminate the subsidy then. The court found she did not.

The findings of the court confirm the current of the evidence that, the silence of the separation agreement notwithstanding, at the time of signature the husband and wife considered a private school education for the boys at Pembroke a settled incident of their mode of life. Since the grandparents Margolin were then the sponsors for the tuition [as they were from the first], and since [as the court found] there was no presentiment that the subsidy would cease at the end of 1987, there was no occasion for an understanding as to how the cost of that education would be allocated between the parents. The decree of dissolution and its custody, maintenance and support, and property division incidents—fashioned in terms of the separation agreement, as the parties intended—were accordingly tacit as to private school education for the boys and the allocation of its cost.

▇▇▇ In any event, whatever the range of actual understanding, no agreement or lapse of agreement between the parents can affect the power of a court to determine child support obligations. § 452.370.5; *In re Marriage of Goodrich*, 622 S.W.2d 411, 413[2] (Mo.App.1981). The decision by the grandparents to discontinue the tuition for the private school left a condition essential to the welfare of the boys, settled since they were three years of age, uncertain and without provision for support. The boys remain enrolled at the Pembroke school, and the tuition for 1988 and 1989 remains unpaid.[1] Each of the parents claims inability to pay for the ex-

1. The court found as a fact that the tuition for academic year 1988 had not been paid. There was testimony that the maternal grandparents made up that expense, perhaps as an advance.

pense, and they are unable to agree to any other placement for the boys, whether a public or private school. The predicament constitutes a change of circumstance so substantial and continuing as to make the terms of the original support decree unreasonable within the sense of § 452.370; 452.-340.1(3), (4). *Stitt v. Stitt,* 617 S.W.2d 645, 647[3, 4] (Mo.App.1981).

The trial court found that, absent a choice of school by the parents, the best interest of the boys was served by continued enrollment at the Pembroke school until further order, or the choice of another school by mutual agreement of the parents. The court found also that each parent had sufficient funds to share the cost of the tuition, ordered an increase of $300 per month per child as support by the father as payment for one-half of the tuition, and ordered the mother to pay the remainder.

The father acknowledges that under § 452.340.1 both parents owe a duty of support to the children. He argues nevertheless that in the determination of changed circumstances to justify a modification of that duty to support, § 452.370.1 directs the court to "consider all financial resources of both parties" and the "earning capacity of a party who is not employed" as well. That evidence, the father insists, does not sustain that the original support award was unreasonable, and hence a cause of action for modification under the statute was not proven. He means by that argument that the wife benefits from a generous income in the form of maintenance and support payments from him and from gifts of cash and property from her parents, ample to meet the tuition for the boys, so that the discontinuance of that subsidy by the grandparents was not a circumstance that rendered the original decree of support unreasonable.

It was the evidence that at the time of the hearing the wife was receiving from the husband a monthly income of $3300 as maintenance and child support, as well as $542 monthly as investment income. These amount to an annual income of $46,104. [Of this total, $27,000 will cease on December 1, 1991 when the obligation of the husband to pay spousal maintenance terminates.] The wife owns a home with a value of about $200,000, and an automobile worth $18,000. Those and other assets, the husband argues, describe a net worth of more than $219,000, "far in excess" of his own. In addition to these resources, her parents purchase for her some $1000 to $1500 in clothes a month, give her money for legal and accounting fees, and for expenses for the children. The wife acknowledged that her parents supplied her with more than $20,000 in 1988 and otherwise will buy for her what she needs. The husband notes that although the wife made no attempt to work during the first four years following the dissolution of the marriage, "the earning capacity of a party who is not employed" is a financial resource the court is directed to consider on a motion to modify a decree of support under § 452.370.1. The wife became licensed to sell real estate and during the fifth year earned $1625 from the sale of a single dwelling.

■ The husband argues quite properly that no resource available to a parent is exempt from the obligation to support the children—and includes the largesse to the parent from a third party. *See Barber v. Barber,* 748 S.W.2d 679, 682[5,6] (Mo.App. 1988). That much is made explicit by the provision of § 452.370.1 that in such a proceeding the court considers "all financial resources of both parties." For such purposes, the court may also impute income to a party who can work but refuses to do so. *Markowski v. Markowski,* 736 S.W.2d 463, 466[2,3] (Mo.App.1987). The husband contends such an imputation follows from the remarks of the wife that: "Her folks didn't raise her to have to work ... [and] her dad would take care of her...."

■ To further support the argument of lack of significant change of circumstance, the husband argues that any financial disadvantage to the wife from the decision of the grandparents to discontinue the tuition payment was offset by the tax brackets restructured after the entry of the original order of support. He says that the testimony of his accountant expert, that the 1986 tax law changes resulted in $6156

more income to the mother and $6732 less income to him, renders the order of the trial court to increase the support in favor of the mother against the weight of the evidence. It was for the trial court to assess the credibility of the witness, even where that testimony is unopposed. *Sheahan v. Sheahan*, 721 S.W.2d 81, 84[3] (Mo.App.1986). In any event, the accuracy of the opinions of the expert assumed, there was no opinion that the increased tax benefit derived to the wife by virtue of the change in law in fact represented an increased value five years after the original decree.

It bears on the weight the trial court attributed to the evidence—if only as a matter of credibility—that the expert presented by the father to assess the financial detriment to him by the changes in the tax law testified that the father has claimed the two boys as tax exemptions since 1985, although not entitled to do so. In 1987 alone, the exemption amounted to $1900 for each child.[2]

▇ Finally, the father asserts that a change of circumstance sufficient to render the original decree unreasonable notwithstanding, the weight of the evidence demonstrates that he lacks the financial ability to pay the increased award of child support. The composite evidence allows the determination reached by the trial court— that the order of support increased to meet one-half of the payment of the tuition for the boys—was within the means of the father, and so rests on substantial evidence. *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976); *Stitt v. Stitt*, 617 S.W.2d 645, 647[3,4] (Mo.App.1981).

Margolin is a lawyer and practices as a partner in a firm that includes his father, the grandparent who subsidized the tuition for the boys. In 1987 his total income was $158,668, of which $125,000 was from the law practice. The current value of his home is $300,000. At the time of dissolution, his net worth was $600,000; separate property and two trust funds made up $500,000 of that sum. After dissolution, he used $100,000 from one of the trusts for a down payment on his house. Since the divorce in 1983, Margolin has spent $370,000 of his net worth. Unremunerated investments accounted for some of that dissipation, and personal expenditures for the rest. It cost $15,000 to enclose a sun deck off the bedroom. Designer furnishings cost another $25,000. There was significant plumbing and electrical improvement to the home. He purchased a new automobile, and in the last five years has vacationed regularly in the Caribbean and elsewhere. The elder Margolin testified that Margolin does not live within his means. It was the testimony of the elder Margolin, as well, that Margolin may be required to leave the firm—and not as a matter of choice. At the time of hearing, Margolin owed the firm $203,169 on an overdrawn capital account. The elder Margolin testified also that Margolin owes him and his wife $71,245.

The father argues that this narrative of a plummeted income, net worth, and financial security shows a depletion of financial means to pay any more than the $39,600 per year support the 1983 decree already imposes, so that the order for increased support money for private school tuition is against the weight of the evidence. He cites the burden of his indebtedness to the firm and to his own parents, the suitability of the public schools for the boys, and the ability of the mother to bear the cost of private tuition, if the public schools are not used.

The usual principles of review of such an order suffice to sustain the award to the judgment that the father pay one-half of the private school tuition for the boys, "in an amount not to exceed Three Hundred Dollars per month per child." There was sufficient proof from which the court could find that, the decline in the personal fortunes of the father notwithstanding, there remained resources sufficient to enable him to pay the increased child support without noticeable impairment to his own needs. § 452.340.1(4). The decisive issue was not

---

**2.** The order of the court entered July 3, 1989, on the modification of the child support obligation of the father granted to him the right to claim the tax exemption for the child Daniel.

credibility, or even the self-indulgence that dissipated the ability of the parent to meet the increased needs of the children. The decree implicitly finds these elements of the proof against the father. *Sheahan v. Sheahan,* 721 S.W.2d at 84[3]; *Moore v. Morgan,* 723 S.W.2d 583, 585[3] (Mo.App. 1987). The crux of the support question, as was evident from the urgent colloquies between the court and parents, was how to maintain the secure center of self-esteem, personal identity, and purpose to achieve the children had accomplished at the Pembroke school. In the determination of that question, "[t]he physical and emotional condition[s] of the child[ren], and [their] educational needs" rest on at least a parity with the financial resources and needs of the parents. §§ 452.340.1; .370.1.

The order that the father increase the support to pay for one-half of the cost of the tuition at Pembroke, moreover, was a decision by the judge made not only reluctantly, but postponed for months to allow the parents to settle the choice of school—private or public. They not only could not come to an agreement; the father refused to even tolerate discussion of private school. In express terms the order nevertheless retains to the parents the right "to mutually agree to another school." The order of modification rests on substantial evidence and properly applies the law. It is sustained.

## II ATTORNEY FEES

The husband contends that the $10,000 award to the wife as attorney fees was an abuse of discretion as not supported by substantial evidence that the amount was reasonable and because the weight of the evidence was that the resources of the wife were ample for that expense.

Section 452.355 empowers a court after consideration of all relevant factors, including the financial resources of both parties, to order one party to pay to another party a reasonable amount as an attorney fee in a proceeding under the Dissolution of Marriage Act. The husband argues that a party must present evidence of the reasonableness of the fees sought for the professional services of an attorney—and do so "in the light of the attorney's expenditure of time"—before an award may properly be entered. Evidence that the attorney fees requested were reasonable was missing, the husband contends, so the proof was insufficient under § 452.355, and the award was erroneous.

In fact, the evidence was that the wife had paid her attorneys $18,935.42 for the services that were the subject of the order. Her exhibit to the court delineated the amount requested in terms of the service rendered, the time expended, and the charge made. The number of hours ascribed to the various services was not contested. Although the systematic method of proof employed by the wife facilitates decision, the trial court—as an expert—may award attorney fees without formal evidence. *Heineman v. Heineman,* 768 S.W.2d 130, 141–142 (Mo.App.1989). The proof sufficed to sustain the order and the reasonableness of the amount awarded.

The husband argues also that there was no evidence of need, and absent such proof, an award for an attorney fee remains unproven. An award under the statute rests on consideration by the court "of all relevant factors," and the financial resources of the parties is but one among them. *Kieffer v. Kieffer,* 590 S.W.2d 915, 917 (Mo. banc 1979). There is no requirement, as such, for the party to prove inability to pay the cost of the litigation in order to have an award of attorney fee. The statute, rather, invests the court with broad discretion under all the evidence in the adjudication of such an award. *Id.* at 918[6]. The full proof, already recounted, was before the court, and the award on that proof sustains the grant of fee to the wife.

## III THE ORDER OF VISITATION

On July 3, 1989, the court entered the final orders on the motion of the father for joint custody and for increased visitation with the children. The judgment denied the motion for joint custody and ordered that "the previous visitation order remain in full force and effect."

■ The husband acknowledges the sufficiency of the visitation order of February 10, 1989—immediately antecedent to that rendered on July 3, 1989—as a judgment and mandate certain as to the rights and liabilities of the parties, and so capable of enforcement. He argues nevertheless that, since there were several antecedent visitation orders made by the court, the judgment of July 3, 1989, was so vague and uncertain as to be incapable of enforcement. A judgment, ambiguous as rendered, may nevertheless be perfected by reference to the whole record and to the character of the proceeding which it culminates. *Massey v. Massey*, 594 S.W.2d 296, 298 (Mo.App.1979); *Jeans v. Jeans*, 314 S.W.2d 922, 925[4–7] (Mo.App.1958).

■ It needs no more than a glance at the transcript of the proceedings to confirm that the order of July 3, 1989, however terse, incorporates, perfects, and decrees as a final judgment the visitation order of February 10, 1989. The issues adjudicated were as presented by the separate motions of the husband and wife. The hearing on the pleadings progressed by episodes, and each successive order responded to the accumulated evidence.

The opinion already recounts the nature of each spate of evidence, the issues addressed by each occasion of proof, and the entry of successive orders, each adjusted by the court to give effect to the best interests of the children under the full proof. It suffices to say that all the orders previous to the decree of February 10, 1989, address only fragments of the case, are interim in effect, and so are temporary in function. Only the Order of Modification of Decree entered on February 10, 1989, addresses all of the issues the motions present. The modification of the decree by an increase in child support and the attorney fee for the wife were finally adjudicated. The modification of visitation the husband requested was finally adjudicated as to Daniel, but as to Andrew was kept open for evaluation pending professional counseling and report. The motion of the husband for joint custody although addressed, was not decided but deferred until June 9, 1989, for further evidence.

That court date passed and the hearing resumed on July 3, 1989, instead. There was no further evidence tendered on the issue of joint custody, but only the comments of counsel. There was only agreement that the Margolins continued at odds and that father and son remained at impasse. Accordingly, the court denied the motion of the husband for joint custody and that judgment was entered as a final adjudication of that issue.

There remained for final determination the issue of visitation between Margolin and Andrew. The order of February 10, 1989, directed that Andrew "have visitation with his father from 6:30 p.m. to 9:30 p.m. on Wednesday nights." The order permitted the "agreement of the parties and child" to modify the schedule. It also provided that Andrew receive psychological counseling, and that a report of that treatment be submitted to enable the court to "reevaluate the situation between Andrew and his father." The reports of the clinical psychologist were presented by the guardian ad litem on the court occasion of July 3, 1989. The "tug of war over the soul of th[e] child [Andrew] continued," the clinician commented, so that only a modest visitation arrangement was recommended: Time with the father for a few hours once a week, after the boy completed his homework. The report suggested another reevaluation after six months. It also urged as an absolute that the Margolins have therapy and mediation.

It was evident to the court from the report and the comments of counsel, however, that the personal relationships among the principals was so intractable that postponement of the visitation decision would not avail. Each parent blamed the other for the status of the education, visitation and other custody decisions. Andrew would not object to public school if the father could not afford Pembroke, but he saw how freely the father spent on himself and his domestic female companion, and did not believe his plea of insufficient means. Andrew also resented the continued resist-

ance on appeal by the father to the order that he pay one-half the Pembroke tuition. The son refused to be made to accept the visitation of a father who, as the boy deemed, did not love him.

It was in that mood of frustrated adjudicative purpose that the trial court, at the conclusion of the July 3, 1989, session, declared:

> Well, I have hung on to this case for quite a while trying to accomplish something. I have failed. I can't hang on to this too long.... *I have got to make a final ruling.... Visitation order will remain the same as it is.* [emphasis added].

The only visitation order extant was that of February 10, 1989. It adjudged that "Andrew is to have no overnight visitation with his father, but will have visitation with his father from 6:30 p.m. to 9:30 p.m. on Wednesday nights. The specific visitations herein ordered may be modified by agreement of the parties and the child." That is the visitation the terse order of July 3, 1989, incorporates, perfects and completes. As such, it is a judgment unambiguous, certain, and capable of enforcement.

### IV  JOINT CUSTODY

The motion of the husband sought the joint legal and joint physical custody of the boys. The order denied the motion altogether. The husband does not contend against the denial of joint physical custody, but argues that the refusal of joint legal custody disregards the preference for joint custody that newly enacted § 452.375, RSMo Supp.1990, establishes. It is a preference of custody arrangement, moreover, that may not be withheld from a parent only because the other parent opposes such a form of custody. The husband argues that there was no substantial evidence to deny him joint legal custody other than the opposition of the wife, so that the order was not only contrary to the statute and to the public policy that it declares, but was also without basis in the proof.

Joint custody to both parents of the children of divorce was introduced into the scheme of custody determinations by the 1983 amendment of § 452.375. Subsection 3 of that amendment provided: "The court may award joint custody or sole custody to either parent ..." [3] It was held that the language of amended subsection 3 was not a disposition in favor of joint custody, but an option—"an additional tool"—for a court in custody decisions to be exercised, as all the others, according to the best interests of the child. *Kline v. Kline,* 686 S.W.2d 13, 16 (Mo.App.1984); *Brisco v. Brisco,* 713 S.W.2d 586, 590[1,2] (Mo.App. 1986).[4]

In 1988, § 452.375 was again amended, subsection 3 was redesignated, and new subsections 3 and 4 were added, among others. Subsection 3 becomes a declaration of public policy, and subsection 4 an order of options in the award of custody. The public policy statement as well as the order of options reaffirm the best interests of the child standard for custody determinations.[5]

> 3. The general assembly finds and declares that it is the public policy of this state to assure children frequent and meaningful contact with both parents after the parents have separated or dissolved their marriage, and that it is in

---

**3.** *Joint custody* was defined by subsection 1 of that amendment to mean "that the parties share the decision-making rights, responsibilities, and authority relating to the health, education and welfare of the child ..." Subsection 1 was then amended in 1984 to distinguish between *joint legal custody* and *joint physical custody.*

> (1) *Joint legal custody* means that the parents share the decision-making rights, responsibilities, and authority relating to the health, education and welfare of the child....
> "(2) *Joint physical custody* means an order awarding each of the parents significant periods of time during which a child resides with

or is under the care and supervision of each of the parents...."

**4.** The 1983 and 1984 amendments to § 452.375, as do all the previous versions of that statute, provide that "[t]he court shall determine custody in accordance with the best interests of the child" and list the "relevant factors" in that consideration.

**5.** The 1988 amendment [subsection 2] retains the "relevant factors" for consideration by the court in custody determinations, and adds two more factors.

the public interest to encourage parents to share decision-making rights and responsibilities of child rearing. In order to effectuate this policy, the court shall determine the custody arrangement which will best assure that parents share such decision-making responsibility and authority and such frequent and meaningful contact between the child and each parent, *as is indicated in the best interests of the child under all relevant circumstances.*

4. Prior to awarding the appropriate custody arrangement *in the best interest of the child,* the court shall consider each of the following as follows:

(1) Joint custody to both parents, which shall not be denied solely for the reason that one parent opposes a joint custody award;

(2) Sole custody to either parent; or

(3) Third party custody;

(a) When the court finds that each parent is unfit, unsuitable, or unable to be a custodian, or the welfare of the child manifestly demands, and *that it is in the best interests of the child,* then custody shall be awarded to any other person or persons deemed by the court to be suitable and able to provide an adequate and stable environment for the child. Before the court places custody with a third person under this subdivision, the court shall make that person a party to the action; ... [emphasis added].

██ The husband discerns in the public policy declaration of subsection 3 a legislative preference for joint custody. It is a policy of preference, the husband acknowledges, that correlates with the best interests of the child. Although the 1988 amendment of § 452.375 is not in terms of preference as such, the order of priority of options subsection 4 imposes on a court in custody determinations bespeaks a preference for joint custody when validated by the best interests of the child. It is a legislative end determinable not only by the text of subsections 3 and 4, but also from the very redesign the amendment accomplishes.

The three alternatives of custody determination subsection 4 lists—joint custody, sole custody, third party custody—are the same in kind, order, and consequence as those of amended subsection 3. All the significant language is the same, except that the new subsection lists them by number and the old subsection discursively. Also, amended subsection 3 provided that the court *may award* joint custody, or any of the alternatives. Since that legislative direction was short of a mandate, the alternatives as enacted in amended subsection 3 were deemed intended only as options open to a court in the determination of custody, and not an expression of preference for joint custody. *Kline v. Kline,* 686 S.W.2d at 16. *See also* Comment, *Child Custody and Support: An Analysis of Missouri law and the Child's Best Economic Interest,* 57 UMKC L.Rev. 289, 295 (1989). The declaration of public policy subsection 3 delivers, that the custody arrangement best assure a shared decision-making responsibility by the parents and significant contact between the child and each parent—abetted by the direction of subsection 4 that the court *shall* consider each option of custody as listed—announces not only a prior option, but a preference for joint custody if "indicated [by] the best interests of the child under all relevant circumstances." § 452.375.3. That was the change intended by the amendment. *Sermchief v. Gonzales,* 660 S.W.2d 683, 688[1–4] (Mo. banc 1983).

The preference the 1988 amendment enacts, however, is not that of a forced joint custody in order to induce the parents to find a common ground. It is a preference, rather, in favor of parents who show the willingness and ability to share the rights and responsibilities of child-rearing even after they have dissolved the marriage. *See* § 452.375.2(1), (3), (5), (6), (8). That is to say the preference for joint custody is one grounded in and validated by the more abiding public policy that in the given circumstances only that custody arrangement is appropriate that best serves the interests of the child. *In re Scarritt,* 76 Mo. 565, 570 (1882); S.B. 164, 1913 Missouri Laws, p. 93 § 6; § 452.375, RSMo Supp.1990. The adjudication of custody under the 1988 amendment, as before, begins and ends with that dominant consideration.

§ 452.375.2, .3, .4. It is the scheme of the amendment that the court determine first whether under all the relevant circumstances joint custody is in the best interests of the child. If so, the inquiry ends. If not, the court continues to the next option in the order enumerated in subsection 4 until the adjudication of custody is done.

The husband does not disagree. He argues that under all of the evidence the best interests of the boys are best served by an order of joint legal custody. He recounts the findings of the court that the wife "consistently bad-mouthed the father" to the children, that the wife lied when she testified that "she didn't know the grandfather was paying the tuition," and other such unfavorable incidents from the evidence to conclude that the only basis for the refusal of joint legal custody was the wife's own opposition. He concludes that the denial to modify the custody arrangement to a joint custody was not only against the weight of the evidence, but also an abuse of discretion.

Joint custody may not be denied solely because one parent opposes such an award. § 452.375.4(1). It was not the opposition of the wife, however, that determined the custody against the husband. It was his unsuitability by unwillingness and even lack of aptitude for the shared decision-making that role demands. It was his inability to communicate with the boys and their mother on any terms but his own. In the context of this litigation, it was most of all the peremptory refusal to respond to the insistent wishes of the boys to continue at the Pembroke school or to explain to them why that could not be accommodated. The indisposition of the wife to share the decision-making duty with the husband as to the boys was also a matter of comment by the court. There was no intimation in the evidence or in the treatment of the evidence by the court, however, that the obduracy of either the wife or husband was prompted by opposition to an award of joint custody.

It is implicit in the findings and commentary, moreover, that the court rested judgment on the empirical fact that as to these parents joint custody was a failure. The first interim order entered by the court during the protracted course of hearing was that of joint legal custody. In addition, the husband was given unrestricted right of visitation of the boys, a virtual joint physical custody. It was the full relief his motions for modification of the custody award requested. The insistence by Margolin on the exercise of that right, despite other plans by the boys, brought them into constant uproar. On the recommendation of the guardian ad litem, the unrestricted right of visitation was superseded by a precise, and as to Andrew, limited schedule. Joint physical custody was effectively discarded as unmanageable. The joint legal custody remained unaffected, but despite the formal order that charted a scheme for mediation to facilitate the habit of agreement on matters pertaining to the religious and other welfare of the boys, they relapsed into disagreement. The only success was the bar mitzvah rite for Andrew, and that only because of the auspices of the rabbi.

The order not to give effect to the preference for joint custody as not in the best interests of the children rests on substantial evidence and is affirmed.

The judgment is affirmed.

All Concur.