**Robin E. McCAULEY, Appellant,**

v.

**Steven SCHENKEL, Respondent.**

**No. 72766.**

Missouri Court of Appeals,
Eastern District,
Division Five.

July 28, 1998.

Rehearing Denied Sept. 30, 1998.

---

**8.** Additionally, plaintiff's converse of the negligence element specifically referenced Instruction

14.

Susan M. Hais, James P. Carmody, Clayton, for appellant.

Lynn C. Ricci, St. Louis, for respondent.

RICHARD B. TEITLEMAN, Judge.

Robin E. McCauley (Mother) and Steven Schenkel (Father) each respectively filed motions to modify their dissolution decree which had awarded the parties joint legal custody and joint physical custody of their daughter, Claire. In their respective motions to modify, each party sought primary physical and legal custody of Claire. Mother appeals the trial court's order which (a) continued joint legal custody and (b) modified the physical custody schedule to a divided custody/alternating week schedule. Mother contends, *inter alia,* that the trial court's determination that continued joint legal custody would be in the best interests of the child is not supported by substantial evidence, and that the court also erred in its provisions concerning the physical custody arrangement. We reverse and remand with directions.

*Background*

Mother and Father were married in October, 1986. Both are professionals. Mother is a doctor of chiropractic and associate professor at Logan College of Chiropractic, and Father is a music Ph.D. and professor of music and media at Webster University. Mother and Father had one child, Claire, born on September 10, 1991.

The parties separated in April, 1994. A Decree of Dissolution was granted on August 2, 1994. The decree incorporated the provisions of a rather detailed "Property Settlement Agreement and Child Care Plan," which had been prepared by a mediator. Mother and Father were awarded joint legal custody and joint physical custody of Claire. Under the decree, Claire changed households four times during the week, alternating between Mother and Father. Additionally, the decree contained provisions for holidays, special days and vacations. Those provisions alternated six major holidays between the parties and also set a schedule for birthdays, Mother's Day and Father's Day. There were no specified vacation periods, but the decree stated:

At any time during the year … each parent shall have the option of having

Claire in his or her care for travel outside the St. Louis metropolitan area for up to eight weeks each year in periods not to exceed four consecutive weeks in length with at least 60 days written notice.

The decree stated that "holiday and special day plans shall supersede week-to-week arrangements, and out-of-town vacation plans supersede both week-to-week and holiday and special day arrangements, except Christmas."

The decree had separate sections concerning health care and education decisions. Generally, on education, it provided that: "Both parents are committed to private school education for Claire, and will discuss and agree on any decision regarding changes of schools, private schooling, special education needs, counseling, or tutoring."

### Problems Following the Decree

Numerous problems began to occur almost immediately after the decree, particularly regarding the physical custody schedule. The problems included, but were not limited to, obvious signs of stress and difficulties caused for Claire by the frequency of back and forth household changes.

Additionally, personal tension, acrimony and constant bickering between Mother and Father were also a problem. Mother accused Father of being verbally abusive in telephone conversations and, at Mother's insistence, the two agreed to communicate with each other by written letters.

Disputes arose concerning Mother's plans to travel with Claire over certain holidays. The decree contained a "vacation loophole" provision that gave out-of-town trips priority over holiday and custody time. Mother twice attempted to use this loophole. Father and Mother disputed Mother's plans to travel with Claire over the July 4th, 1995 holiday. Mother sent Father a notice in late April or early May 1995 that she would be traveling out-of-town with Claire over the July 4th holiday. She claimed she had been unable to schedule the trip earlier because of Father's out-of-town plans. Though this notification was within the provision of the decree regarding out-of-town travel, Father responded by sending Mother a schedule of his "future travel plans" for himself and Claire. This schedule included most major holidays through the year 2001.

Mother also desired to schedule a trip with Claire to visit relatives from December 15 until December 20, 1995. Father initially said it would be "fine" for Claire to go, so Mother booked a flight. Subsequently, Father requested two separate "compensation days" with Claire and he declared that if Mother did not "respond in the affirmative," then she should "not plan on any travel with Claire during the month of December." Mother agreed to the requested "compensation days," but also informed Father that she anticipated the Christmas holiday would be scheduled according to the decree, rather than under a looser arrangement that he wanted. Dissatisfied, Father asked Mother shortly before the trip if she still planned to leave town with Claire. When she told Father that she was still planning to go, Father told her, in Claire's presence, that he would "have [Mother] arrested" when she arrived if she took the trip with Claire. Father then contacted the local police department and reported that Mother was going to travel with Claire without his consent. A police officer came to Mother's house and spoke to Mother and Claire about the planned trip and took no further action.

Father never reconsidered his position and Mother cancelled the trip. On December 19th, which would have been the second to the last day of Mother's trip with Claire, Father sent Mother a note enclosing an article from the *St. Louis Post Dispatch* concerning the arrest of a mother for kidnapping her 3–year old son. Father signed the note "Love, Steve."

Disputes over education-related matters also arose. For instance, Mother enrolled Claire in a dance class during Father's custody time without consulting him first. Mother also enrolled Claire in a program called "Broken Rainbow" that Father objected to because of what he perceived to be its "anti-father bias."

Additionally, the parties disagreed as to whether Mother could occasionally ask someone else to pick up Claire from pre-school.

At times, Mother had asked a woman named Louise Keney to pick up Claire from preschool during Mother's physical custody periods. Ms. Keney has known Mother and Father for about ten (10) years and she has watched Claire at Father's request as well as Mother's. In January 1996, after Ms. Keney had picked up Claire at pre-school, Father wrote a letter to Claire's school stating:

As of this date, Claire is not to be picked up from school by anyone other than her Mother or me on any occasion without my written permission for that specific occasion.

Shortly after writing the letter, Father kept Claire home from school, and when Ms. Keney tried to pick up Claire at Father's house at Mother's request, he would not release Claire until the police were involved.

### Motions to Modify and the Rohan Woods School Dispute

In January, 1996, Mother filed a Motion to Modify the Decree, seeking to terminate joint legal and joint physical custody, and seeking an award of primary physical and legal custody of Claire, subject to reasonable rights of temporary visitation and temporary custody of Father.

In April, 1996, Father filed his cross Motion to Modify the Decree seeking sole custody. Father stated that if he were awarded sole custody, he would equally share custody with Mother.

While the Motions were pending, a much more serious dispute developed involving Claire's placement in Rohan Woods School. Both parents had agreed that they desired for Claire to attend Rohan Woods. However, when the school sent Claire's acceptance letter and contract to Mother, and sent a carbon copy to Father, Father became very angry and sent a letter to the Rohan Woods Headmaster. Father stated, in pertinent part:

I apparently did not make myself clear during our visit last month. I will be party to no agreement that I have not read. I will make no payments for tuition to your school unless I am fully a part of all transactions and mailings. [Mother] does not have sole or primary custody of

my daughter; we have joint custody.... I insist on being a major participant in Claire's education.

I am not interested in being "CC'ed" on letters to [Mother]. I have a name and an identity separate from my ex-wife's. If I am to be a financial participant in Claire's life I must insist on also being regarded as a full parent with full rights and opportunities to contribute to Claire's upbringing. Anything less is totally unacceptable to me.

As a result of this letter, the Headmaster wrote Father back and withdrew Claire's acceptance to Rohan Woods because it was "apparent from the content and tone of your letter that there are some unsettled issues in the divorce." In response, Father sent the Headmaster a letter thanking him for "understanding the plight of the divorced father."

In the meantime, other private schools in the area were wait-listing students who had not already been accepted. Mother contacted every major private school regarding enrollment for that fall and found one, Andrews Academy, that Claire could still attend. Mother scheduled Claire for a Kindergarten evaluation at Andrews Academy, then informed Father of the appointment. In response, Father cancelled the appointment at Andrews Academy and sent Mother a letter stating he had "never heard of Andrews Academy" and accusing Mother of attempting to "subvert [his] role in raising [their] daughter." Mother proceeded in attempting to get Claire evaluated and accepted into Andrews Academy, then sent Father a letter extolling the virtues of Andrews Academy and encouraging him to visit the school. Mother's letter explained that other private schools had already completed their selection process for the upcoming year. In response, on April 25, 1996, Father sent Mother a letter stating:

In accordance with the court order of August 2, 1994 I am to be fully involved in all decisions and processes regarding Claire's education. Until such time as you are in full compliance with the court's decree I

cannot give my consent to any education decision.

On May 9, 1996, Mother filed a Motion to Cite and Punish Respondent for Contempt and seeking an award of primary legal custody pending modification of the court's Judgment/Decree. The court's Order to Show Cause originally scheduled a hearing on Mother's contempt motion on June 24, 1996. Later, an Amended Notice of Hearing was filed, and ultimately the motion was scheduled for hearing on August 19, 1996.

Prior to that date, because of the approaching school year, the parties appeared in court for a settlement conference at which the court agreed to consider the issues raised in the Motion for Contempt. The motion was not formally presented to the court, but both parties spoke directly to the Judge and made a commitment to try to get Claire back into Rohan Woods.

Ultimately, Claire was readmitted to Rohan Woods. The school required both parents to sign an addendum agreeing that if there is any more acrimony between them, Claire will be removed from the school.

### Judgment Modifying the Decree

The Motions to Modify were tried to the court on April 22, 1997. At trial, Mother requested that the trial court modify the physical custody schedule set forth in the Decree and enter a plan that was "simple to understand" and "straight forward." She requested that Father have physical custody every other weekend, an evening and overnight each week, and on alternating major holidays. Father also sought modification of the physical custody schedule, requesting that he have custody of Claire every Monday and Tuesday and that Mother have custody every Wednesday and Thursday. Father proposed that Fridays, Saturdays and Sundays be alternated.

Evidence was adduced regarding all the various above-described problems and disputes between the parties. In addition, Father testified that the parents' relationship was "a lot better" since speaking with the Judge on the Rohan Woods school issue. Improvements he cited included successfully enrolling Claire in Rohan Woods, selecting a summer camp, communicating about doctor and dentist appointments, and arranging for choir performance. Father directed the Christmas pageant, and Mother attended with her friend Ms. Louise Keney. However, Mother declined to acknowledge any cooperation between the parents.

On April 24, 1997, the trial court granted its Judgment Modifying Decree of Dissolution. The Judgment stated that both Mother's and Father's Motions to Modify were "heard and sustained." It went on to find that the "best interest of [Claire] would be served by [Mother] and [Father] having joint physical and joint legal custody." The court found, *inter alia,* that:

> Since the date of dissolution each parent, in his/her endeavor to assert dominance in the child's life, has actively interferred [*sic*] in the child developing a sense of security. Each shall stop immediately his/ her detrimental search for unintended loopholes in custody provisions and harmful insistence on illogical consequences.

The court further ordered as follows:

> Given the frequency with which the parties have involved the police in resolving their problems, all transfers of custody shall take place at the front door of the Family Court Center, formerly known as Juvenile Court, 501 S. Brentwood Blvd., Clayton, Mo.

The Modification Judgment modified the original Decree by making the following provision for physical custody of Claire:

> [Mother] is awarded primary physical custody of the child for seven days beginning April 27, 1997 at 6:00 p.m. and ending May 4, 1997 at 6:00 p.m. [Father] is awarded primary physical custody of the child for the seven days beginning May 4, 1997 at 6:00 p.m. and ending May 11, 1997 at 6:00 p.m. The parties shall alternate custody thereafter every seven days with the seven-day period of custody beginning and ending at 6:00 p.m. on Sunday each week.

Mother filed a post-trial Motion, which the trial court denied on June 16, 1997. This appeal followed.

*Point I*

In her first point, Mother contends the trial court erred in that the decision not to terminate joint legal custody is unsupported by substantial evidence and is a misapplication of law. Mother argues the overwhelming weight of evidence showed that the parties were unable to effectively communicate and cooperate with one another concerning child-rearing matters, and that continued joint legal custody was therefore contrary to the child's best interests.

■■■ Appellate review in this case is governed by Rule 73.01(c) and the principles set forth in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court must be affirmed unless it is unsupported by substantial evidence, or is against the weight of the evidence, or misstates or misapplies the law. *Murphy,* 536 S.W.2d at 32. Where the custody of a child is at issue, the welfare of the child is the primary consideration. *Riley v. Riley,* 904 S.W.2d 272, 275 (Mo.App. E.D.1995). In custody cases an appellate court should exercise its power to set aside the trial court's judgment or decree on the ground that it is against the weight of the evidence only with caution and with a firm belief that the decree is wrong, and only if it is firmly convinced that the welfare of the child requires another disposition. *Luther v. Vogel,* 863 S.W.2d 902, 904 (Mo.App. E.D.1993); *M.P. v. S.P.,* 793 S.W.2d 510, 511 (Mo.App. E.D.1990). This is such a case.

■■■ Modification of child custody decrees is governed by Section 452.410 RSMo 1994.[1] That statutory section provides that a court with jurisdiction can modify a prior decree if it finds, "upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree," that "a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child." Section 452.410.1 RSMo. In the context of joint custody, a breakdown of parental communication and cooperation is sufficient, in and of itself, to constitute a change in circumstances which can afford the basis for modifying a

prior decree. *Rodriguez v. Rodriguez,* 801 S.W.2d 80, 85 (Mo.App. S.D.1990).

■■■ "Joint legal custody" means that the parents share the decision-making rights, responsibilities and authority relating to the health, education and welfare of their child. Section 452.375.1(1) RSMo Supp.1995; *Luther v. Vogel,* 863 S.W.2d at 904; *Burkhart v. Burkhart,* 876 S.W.2d 675, 679 (Mo.App. W.D.1994). A commonality of beliefs concerning parental decisions, and the ability of the parties to function as a parental unit in making those decisions, are two important considerations in determining whether joint legal custody is in the child's best interests. *Lipe v. Lipe,* 743 S.W.2d 601, 602 (Mo.App. E.D.1988); *Luther v. Vogel,* 863 S.W.2d at 904; *In re Marriage of Haynes,* 913 S.W.2d 73, 75 (Mo.App. E.D.1995).

■■■ Joint legal custody is only appropriate where the parents "demonstrate the willingness and ability to share the rights and responsibilities of raising their children." *Leone v. Leone,* 917 S.W.2d 608, 614 (Mo.App. W.D.1996) (citing *Margolin v. Margolin,* 796 S.W.2d 38, 50 (Mo.App. W.D.1990)). "Where the parties are unable to communicate or cooperate and cannot make shared decisions regarding the welfare of their children, joint custody is improper." *Id.* Thus, for example, in *Shockley v. Shockley,* 882 S.W.2d 775, 776 (Mo.App. E.D.1994), where the parties "constantly bickered" as to matters relating to their child, this Court found that the evidence did not fairly support a conclusion that the parents could effectively function as a decision-making unit, and accordingly we set aside the trial court's modification decree which had ordered joint legal custody. And in *In re Marriage of Haynes,* 913 S.W.2d at 75, we upheld the trial court's decision to terminate joint legal custody because the parents were unable to agree on decisions regarding their child's medical care. See also *Burkhart v. Burkhart, supra,* reversing an award of joint legal custody when the parties could not even agree on appropriate visitation between themselves.

It is true, as Father suggests, that joint legal custody is not always or necessarily

1. All further statutory references are to RSMo 1994 unless otherwise noted.

inappropriate merely because there is some level of personal tension and hostility between the former spouses. We have previously held that continued joint legal custody can be appropriate in such circumstances, *provided that* there is substantial evidence that despite this acrimony the parties nonetheless have the ability and willingness to fundamentally cooperate in making decisions concerning their child's upbringing. *Luther v. Vogel*, 863 S.W.2d 902, 904 (Mo.App. E.D. 1993). Likewise, in *Gulley v. Gulley*, 852 S.W.2d 874, 876 (Mo.App. E.D.1993), we found that despite the somewhat acrimonious relationship between the parties there was no indication they could not effectively work together in making decisions concerning their child's upbringing, and hence that joint legal custody was appropriate.

Here, however, the situation is considerably different than in either *Vogel* or *Gulley*, and is more akin to *Shockley, Haynes* and *Burkhart*. The evidence adduced at trial does not support the continuation of joint legal custody. First, there was evidence of constant, ongoing, severe tension and bickering between the parties. Second, the evidence showed that the parties were not able to speak to each other civilly on the telephone, and in essence would communicate with each other only in writing. Third, the Rohan Woods School dispute provided uncontroverted evidence that, unlike the situation in *Gulley*, here the parties clearly did not have the ability to set aside their personal acrimony in making important decisions relating to their child's welfare. The fact that Claire ultimately was readmitted to Rohan Woods came only after pressure was exerted on the parties by the court as a result of Mother's civil contempt motion against Father. The failure to communicate, cooperate and function as a parental unit in making important child-related decisions is indicated by the parents litigating with each other in order to get their child into kindergarten. Finally, the trial court found that the ongoing breakdown in communication and cooperation between these parents was of such magnitude that it required all future exchanges of physical custody to take place at the courthouse door. That finding—which is amply supported by the evidence—simply is not consistent with a finding that the parties can jointly make all decisions about their child's health, education and welfare.

Father argues the trial court's decision should be affirmed because there is a statutory preference in favor of joint legal custody. But to the extent that such a preference exists, it "is not that of a forced joint custody in order to induce the parents to find a common ground." *Margolin v. Margolin*, 796 S.W.2d 38, 49 (Mo.App. W.D.1990). "It is a preference, rather, in favor of parents who show the willingness and ability to share the rights and responsibilities of child-rearing even after they have dissolved the marriage." *Id.; Burkhart v. Burkhart*, 876 S.W.2d at 680. The preference is simply a legislative recognition that a functioning parental unit is most likely to be beneficial to a child. *Luther v. Vogel*, 863 S.W.2d at 904. There is no preference for joint custody unless, in the given circumstances, it is in the best interests of the child. *Margolin* at 49; *In re Marriage of Haynes*, 913 S.W.2d at 74–75; *In re Marriage of Johnson*, 865 S.W.2d 412, 417 (Mo.App. S.D.1993).

Father also argues that his testimony at trial showed that the parties had gotten along somewhat better since resolution of the Rohan Woods School dispute, and that from this evidence the trial court could have inferred that continued joint legal custody might be workable. However, given the circumstances here, an order continuing joint legal custody "requires more than that the two parents 'have gotten along better in communications.'" *Rogers v. Rogers*, 923 S.W.2d 381, 384 (Mo.App. W.D.1996). As in that case, so here too, such "evidence presented by father does not allay the concerns that accompany the need for reasonable and cooperative efforts of shared authority in the major decisions of the children." *Id.*

An order granting joint legal custody must be based on substantial evidence which fairly supports the conclusion that the parents have a commonality of beliefs concerning parental decisions, as well as the willingness and ability to function as a unit in making those decisions. *Johnson*, 865 S.W.2d at 417; *Burkhart* 876 S.W.2d at 680.

The record here does not support the conclusion that Mother and Father can communicate, cooperate and work together in the exercise of decision-making rights and responsibilities concerning their child. We find the order granting joint legal custody to be against the weight of the evidence.

As the continuation of joint legal custody was error, one of the parties should have been awarded sole legal custody. Under the circumstances we believe the trial court is in a better position than this court to determine which parent should be the child's legal custodian, and we thus decline to exercise the authority embodied in Rule 84.14. *Massman v. Massman,* 749 S.W.2d 717, 721 (Mo.App. E.D.1988). Accordingly, the judgment in favor of joint legal custody is reversed and the cause is remanded for determination of an award of sole legal custody.

### Point II

In her second point on appeal, Mother maintains that the trial court erred in its apportionment of joint physical custody.[2,3] Rather than adopting the divided custody/alternating week schedule that it did, Mother argues, the court should have modified the joint physical custody arrangement by (a) granting the major share of custody to Mother and (b) granting Father what amounts to a *Siegenthaler*-style temporary custody schedule.[4]

In view of our holding that the evidence in the record does not support an award of joint legal custody, we conclude that the trial court should have the opportunity upon remand to reconsider the issue of physical custody as

well, after a hearing at which both parties will be given the opportunity to present evidence concerning the most appropriate physical custody plan for Claire.

Accordingly, we reverse the portions of the judgment retaining joint legal custody and modifying the physical custody schedule, and remand the cause for a determination of an award of sole legal custody and for a determination of physical custody.

CRAHAN, P.J. and CHARLES B. BLACKMAR, Senior Judge, concur.

---

2. On appeal, Mother specifically indicates that she does not challenge the trial court's decision to retain joint physical custody, but rather only disputes the appropriateness of the custody schedule that the court adopted. Mother states in her brief "the trial court could have and should have maintained joint physical custody, but merely adjusted Claire's schedule to redistribute Claire's time with Father."

3. Section 452.375.1(2) RSMo Supp.1995, defines the term joint physical custody as follows:
"Joint physical custody" means an order awarding each of the parents significant periods of time during which a child resides with or is under the care and supervision of each of the parents. Joint physical custody shall be shared by the parents in such a way as to

assure the child of frequent and continuing contact with both parents.

4. The "Siegenthaler Schedule" is a standard schedule of temporary custody frequently utilized in decrees entered in St. Louis County. Patterned after the provisions in *Siegenthaler v. Siegenthaler,* 761 S.W.2d 262, 266 (Mo.App. E.D. 1988), it essentially awards primary custody to one parent, and temporary custody on Wednesday nights and alternating weekends and on certain holidays in alternating years to the other parent. It also provides three non-consecutive two week periods of custody during the summer. *Riley v. Riley,* 904 S.W.2d 272, 274 n. 1 (Mo.App. E.D.1995).