

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| JERAMIE RENO, et al., | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | **WD78439** |
| | ) | |
| ROBIN R. GONZALES, | ) | **FILED: May 10, 2016** |
| Appellant. | ) | |

### Appeal from the Circuit Court of Clay County
#### The Honorable David P. Chamberlain, Judge

### Before Division Four: Alok Ahuja, C.J., Thomas H. Newton, J.
### and Chares H. McKenzie, Sp. J.

Appellant Robin Gonzales appeals from a judgment of the Circuit Court of Clay County. The judgment addressed Respondent Jeramie Reno's petition to determine father-child relationship, custody, and child support and visitation, as well as Gonzales' counter-petition. The judgment awarded Gonzales and Reno joint legal custody over their child, and awarded Gonzales sole physical custody, with Reno receiving substantial unsupervised visitation. On appeal Gonzales argues that the trial court erred by ordering joint legal custody, and awarding Reno unsupervised visitation. We reverse, and remand to the circuit court for further proceedings.

### Factual Background

On December 22, 2006, Robin Gonzales gave birth to the parties' son in Buchanan County. Although Gonzales and Reno were not married, Reno held the child out as his

biological son from birth and was listed as the father on the child's birth certificate. Reno and Gonzales resided together and raised the child as mother and father until the child was seven years old.

Eventually, the relationship between Reno and Gonzales soured, and the parties separated. On March 14, 2014, Reno filed a Petition for Determination of Father-Child Relationship, Order of Custody, Order of Child Support and Visitation in Clay County Circuit Court. Gonzales filed a counter-petition.

On April 2, 2014, the circuit court entered an Interlocutory Judgment and Order of Paternity declaring Reno to be the child's natural father. On the same date, the court also entered an Order of Temporary Custody granting Reno sole legal custody and joint physical custody to both Reno and Gonzales, with the child principally residing with Reno.

On September 24, 2014, the circuit court modified the Temporary Order to grant Gonzales sole legal and physical custody of the child. The court ruled that Reno's weekly visits with the child should be supervised by Transitions Family Visitation Center until further order of the court, based on the court's finding that "at present, unsupervised visitation would endanger the minor child's physical health or impair his emotional development, pursuant to § 452.400.1 RSMo."

Following a bench trial, the court entered its final judgment on February 5, 2015. The court awarded Gonzales and Reno joint legal custody. The court awarded Gonzales sole physical custody, but ordered that Reno have unsupervised visitation with the child every alternating weekend and on Wednesday evenings, as well as on certain holidays. Gonzales appeals, challenging both the award of joint legal custody, as well as the provisions of the judgment giving Reno substantial unsupervised visitation.

2

**Standard of Review**

"This Court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Pasternak v. Pasternak*, 467 S.W.3d 264, 268 (Mo. banc 2015) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)).[1]

**Analysis**

**I.**

Gonzales' first Point challenges the circuit court's award of joint legal custody.

Joint legal custody is defined by statute as an arrangement where "parents share the decision-making rights, responsibilities, and authority relating to the health, education and welfare of the child, and, unless allocated, apportioned, or decreed, the parents shall confer with one another in the exercise of decision-making rights, responsibilities, and authority[.]" § 452.375(2), RSMo.[2]

Section 452.375.4 contains the following legislative declaration of policy with respect to joint legal custody:

---

[1]    In numerous decisions this Court and the Missouri Supreme Court have stated that the court "gives even more deference to the trial court's judgment in a custody matter than in other matters." *Hightower v. Myers*, 304 S.W.3d 727, 732 (Mo. banc 2010). The Missouri Supreme Court recently held, however, that the same standard of review applies in *all* court-tried civil cases:

> Prior statements from this and other Courts to the effect that greater deference is paid to the trial court in certain types of cases (e.g., family law) than in others are incorrect and misleading. Those prior statements should not be read to mean anything more than that such cases often require the trial court to weigh a great deal of conflicting evidence before finding the highly subjective facts required by the applicable statutory factors.

*Ivie v. Smith*, 439 S.W.3d 189, 199 n.9 (Mo. banc 2014).

[2]    "While this appeal stemmed from a paternity action, we note that 'Section 452.375 governs the initial award of custody in paternity cases, as well as dissolution cases.'" *M.P.P. v. R.R.E.*, 456 S.W.3d 69, 70 n.1 (Mo. App. E.D. 2015) (quoting *Day ex rel. Finnern v. Day*, 256 S.W.3d 600, 602 (Mo. App. E.D. 2008)); *see also Lampe v. Rust*, 190 S.W.3d 631, 632 (Mo. App. W.D. 2006).

3

The general assembly finds and declares . . . that it is the public policy of this state to encourage parents to participate in decisions affecting the health, education and welfare of their children, and to resolve disputes involving their children amicably through alternative dispute resolution.   In order to effectuate th[is] polic[y], the court shall determine the custody arrangement which will best assure both parents participate in such decisions . . . so long as it is in the best interests of the child.

Section 452.375.5 then requires that, "[p]rior to awarding the appropriate custody arrangement in the best interest of the child," the court "shall consider" awarding joint legal and physical custody, before entering a judgment awarding sole legal or physical custody to one parent.

The statutory preference for joint legal custody does not displace the paramount consideration in making child custody determinations:  the best interests of the child.

The declaration of public policy subsection [4] delivers, that the custody arrangement best assure a shared decision-making responsibility by the parents and significant contact between the child and each parent – abetted by the direction of subsection [5] that the court *shall* consider each option of custody as listed – announces not only a prior option, but a preference for joint custody if indicated [by] the best interests of the child under all relevant circumstances.  . . .

The preference the [statute] enacts, however, is not that of a forced joint custody in order to induce the parents to find a common ground.  It is a preference, rather, in favor of parents who show the willingness and ability to share the rights and responsibilities of child-rearing even after they have dissolved the marriage.  That is to say the preference for joint custody is one grounded in and validated by the more abiding public policy that in the given circumstances only that custody arrangement is appropriate that best serves the interests of the child.  The adjudication of custody under the [statute], as before, begins and ends with that dominant consideration.  It is the scheme of the amendment that the court determine first whether under all the relevant circumstances joint custody is in the best interests of the child.  If so, the inquiry ends.  If not, the court continues to the next option in the order enumerated in subsection [5] until the adjudication of custody is done.

*Margolin v. Margolin*, 796 S.W.2d 38, 49-50 (Mo. App. W.D. 1990) (citations and internal quotation marks omitted); *see also In re Marriage of Sutton*, 233 S.W.3d 786, 791 (Mo. App. E.D. 2007); *McCauley v. Schenkel*, 977 S.W.2d 45, 51 (Mo. App. E.D. 1998) ("There is no preference for joint [legal] custody unless, in the given circumstances, it is in the best interests of

the child."). Section 452.375.4 "does not create a presumption in favor of joint custody." *Kroeger-Eberhart v. Eberhart*, 254 S.W.3d 38, 47 (Mo. App. E.D. 2007) (citation omitted).

"The parents' ability to communicate and cooperate is crucial in considering whether joint legal custody is proper." *Pasternak*, 467 S.W.3d at 273 (quoting *Mehler v. Martin*, 440 S.W.3d 529, 536 (Mo. App. S.D. 2014)). "[J]oint legal custody is not always or necessarily inappropriate merely because there is some level of personal tension and hostility between the former spouses." *McCauley*, 977 S.W.2d at 50-51. However, such custody is appropriate only if "there is substantial evidence that despite this acrimony the parties nonetheless have the ability and willingness to fundamentally cooperate in making decisions concerning their child's upbringing." *Id*. at 51 (citation omitted).

"'If the parents are unable to make shared decisions concerning the welfare of the children, joint custody is not in the best interests of the children.'" *Pasternak*, 467 S.W.3d at 274 (quoting *Mehler*, 440 S.W.3d at 536). Accordingly, "[i]f there is no substantial evidence in the record that the parties have a commonality of beliefs concerning parental decisions and the willingness and ability to function as a unit in making those decisions, a trial court's award of joint legal custody must be reversed." *Sutton*, 233 S.W.3d at 790.

The circuit court's own factual findings demonstrate that joint legal custody was unwarranted in this case. The judgment expressly finds that the parties had been unable to co-parent:

> In its Order of Temporary Custody entered April 2, 2014, this Court found that the parties had shown no commonality of beliefs concerning parental decisions and had demonstrated neither willingness nor ability to function as a unit in making these decisions. Indeed, [Reno] has demonstrated an unwillingness to communicate with [Gonzales] about issues concerning the minor child. Although the April 2, 2014 Order required [Reno] to promptly inform [Gonzales] of any serious medical condition of the child, [Reno] failed to notify [Gonzales] when he took the child to urgent care for treatment of infected bug

5

bites and when the child was prescribed asthma medication. [Reno] also failed to notify [Gonzales] of injuries the minor child suffered when [Reno] crashed the motorcycle he and the child were riding. [Gonzales] presented text messages in which [Reno] called her derogatory names, and [Gonzales] testified that [Reno] has used such language towards her in the minor child's presence.

The judgment also finds that, when the child was residing primarily with Reno, he denied Gonzales one of her court-ordered visits, "and habitually denied her telephone contact with the child." The judgment's findings concerning a pattern of domestic violence, Reno's endangerment of the child's welfare, and his untreated substance abuse problems, which are described in § II, below, provide additional indications that joint legal custody was unjustified. Given the trial court's factual findings, the award of joint legal custody must be reversed. *Halford v. Halford*, 292 S.W.3d 536, 545 (Mo. App. S.D. 2009) (reversing award of joint legal custody where judgment contained similar factual findings).

Reno did not file a brief in this appeal. From our own review of the record, the *only* testimony we have discovered which might tend to demonstrate the parties' ability to communicate and cooperate is the following exchange regarding a visit to Children's Mercy Hospital for allergy testing for their son.

> [Reno]: . . . How would you say that our communication with each other was that day?
>
> [Gonzales]: I think it was the typical. The first time you put [the child] down about having his purple socks. You put him down about his hair not being cut, put him down about having purple hair for Halloween. It was the typical put-[the child]-down situation.
>
> [Reno]: I was actually referring to the conversations that me and you had about some of [the child's] medical history. We actually had to have quite a bit of talking with each other that day.
>
> . . . .
>
> The Court: . . . The question he's asking is how did you all get along.
>
> [Gonzales]: Yeah, we did good that day. We did do good that day.

6

[Reno]:  And I'd have to agree.

The trial court's judgment does not refer to this single episode during which the parties were apparently able to function as a unit.  Indeed, given the trial court's express finding that Reno and Gonzales "had shown no commonality of beliefs concerning parental decisions and had demonstrated neither willingness nor ability to function as a unit in making these decisions," it appears that the court found this single incident to be insignificant in determining the parties' ability to co-parent.  This isolated passage from the trial transcript is insufficient to sustain the award of joint legal custody.  *See In re Marriage of M.A.*, 149 S.W.3d 562, 569-70 (Mo. App. E.D. 2004) (reversing award of joint legal custody despite father's testimony "that he thought he and mother could 'jointly make decisions regarding the kids' best welfare and interest,'" where "[t]here was no evidence that father and mother have a commonality of beliefs concerning parental decisions, and a willingness, as well as an ability, to function as a unit in making those decisions"); *McCauley*, 977 S.W.2d at 51 (evidence that parents more recently "had gotten along somewhat better" was insufficient to support circuit court's award of joint legal custody, in light of "evidence of constant, ongoing, severe tension and bickering between the parties").

We recognize that, in its comments from the bench at the conclusion of the trial, the circuit court indicated that it desired to give Reno a final opportunity to give up alcohol and drugs, and to participate responsibly in raising his child.  While this may be a laudable motivation, it cannot support an award of joint legal custody where there was no evidence that the parties had, in fact, been able to co-parent previously.  "The preference for joint custody stated in section 452.375 does not mandate a joint custody award designed to induce parents to find common ground; rather it expresses a preference in favor of parents who show the willingness and ability to share child-rearing rights and responsibilities."  *Kroeger-Eberhart*, 254 S.W.3d at 48; *see also Sutton*, 233 S.W.3d at 792 ("The trial court's orders were designed to

7

force the parties to cooperate in order to maintain joint legal custody, a result that . . . is not contemplated by section 452.375.4."). Even if the parties had expressed aspirations to work together in the future despite their past problems (which they had not), "[t]he parties' assertions that they think they can talk, or that they hope to work together once they have a court order to do so, does not overcome the evidence of their prolonged, demonstrated inability to the contrary." *Kroeger-Eberhart*, 254 S.W.3d at 49. Without evidence of the parties' *present* ability to make joint decisions in the child's best interests, the *hope* that they might do so in the future was an insufficient basis to support the award of joint legal custody.

"An order granting joint legal custody must be based on substantial evidence that fairly supports the conclusion that the parties have a commonality of beliefs concerning parental decisions, as well as the willingness and ability to function as a unit in making those decisions." *Sutton*, 233 S.W.3d at 790 (citation and internal quotation marks omitted). Here, the judgment demonstrates that there was not substantial evidence to support an award of joint legal custody. We reverse the provisions of the judgment awarding the parties joint legal custody, and remand to the trial court for further proceedings with respect to the legal custody issue. On remand, "[i]t is within the trial court's discretion to reopen the record and receive additional evidence concerning legal custody, given the passage of time since trial and judgment." *Kroeger-Eberhart*, 254 S.W.3d at 49. We emphasize that the existing record does *not* support an award of joint legal custody; therefore, if the trial court chooses not to receive additional evidence concerning legal custody on remand, its authority will be limited to determining which party should be awarded sole legal custody.

## II.

In its judgment, the trial court awarded Gonzales sole physical custody, but awarded Reno visitation with the child on alternating weekends and every Wednesday evening, as well as

longer periods in summer and on holidays. The judgment provided for exchange of the child at the parties' residences. The judgment also provided that Gonzales was entitled to demand that Reno submit to a portable alcohol test before leaving with the child; if the test showed the presence of alcohol, Reno would not be entitled to conduct visitation, and would be responsible for the cost of the testing.

Gonzales' second Point contends that the circuit court's award of substantial, unsupervised visitation to Reno, and its specification of the manner in which that visitation was to be exercised, was against the weight of the evidence.

The circuit court's judgment contains numerous, specific factual findings concerning Reno's behavior which call into question the parenting plan the court adopted. In addition to the findings discussed in § I, above, the judgment also found

- that Reno has a substance abuse problem, has used methamphetamine and marijuana on a regular basis, has been convicted of possession of methamphetamine, and tested positive for the presence of marijuana during the pendency of the case;

- that Reno "admitted that he has an alcohol dependency problem but has not sought any treatment," and has made numerous Facebook posts about getting drunk, drinking after putting the child to bed, and operating a motorcycle or bicycle after having multiple drinks;

- that Reno was convicted of driving while intoxicated during the pendency of the case, and had his driver's license suspended for refusing to submit to a breathalyzer test, but continued to drive with the child in his vehicle despite his license suspension;

- that Reno lied to the guardian *ad litem* concerning his current use of drugs and alcohol;

- that Reno's sixteen-year-old daughter was removed from his custody by Kansas authorities during the pendency of this case, based on reports of drugs and drug paraphernalia in Reno's home;

- that Reno "subjected [Gonzales] to a pattern of domestic violence," including slapping her on the leg, punching her in the face, throwing her into the trunk of a car, and breaking into her home and stealing her car and money;

9

o that Reno has "'backhanded' the minor child once, knocking him out of his chair at the dinner table";

o that Reno "had endangered the minor child's physical health by, *inter alia*, allowing the child to ride motorcycles and dirt bikes without a helmet; allowing him to ride in the front seat of [Reno's] truck without a booster seat or safety belt; ripping the sink out of the family's kitchen while high, so that the family had to wash their dishes in the bathtub for several months; and failing to bathe the child for four days straight";

o that Reno "has bullied the minor child by, for example, yelling at him, calling him 'stupid,' and forcing him to ride amusement park rides that clearly terrified him";

o that Reno burned wood for heat in his home, which exacerbated the child's asthma;

o that Reno "physically abused [Gonzales'] oldest child," by engaging in a fist fight with him when he was thirteen, and spanking him with a belt;

o that Reno has threatened to kill himself; and

o that although Reno was granted supervised visitation with the child in an order entered on September 24, 2014, he had not contacted the visitation center to arrange a visit until January 2015, and spoke to the child by telephone only three times during that period.

In addition to the factual findings contained in the judgment, we also note that, in its September 2014 order concerning temporary custody, the circuit court had found that Reno was entitled to only supervised visitation, based on its finding that "at present, unsupervised visitation would endanger the minor child's physical health or impair his emotional development, pursuant to § 452.400.1 RSMo."

As discussed in § I above, we are reversing the judgment, and remanding the case to the circuit court for further proceedings, because the factual findings in the judgment, and the evidence adduced at trial, do not justify an award of joint legal custody to the parties. "In view of our holding that the evidence in the record does not support an award of joint legal custody, we conclude that the trial court should have the opportunity upon remand to reconsider the issue of physical custody as well, after a hearing at which both parties will be given the opportunity to

10

present evidence concerning the most appropriate physical custody plan for [their child]."

*McCauley v. Schenkel*, 977 S.W.2d 45, 52 (Mo. App. E.D. 1998).[3]

**Conclusion**

We reverse the circuit court's judgment, and remand the case to the circuit court for further proceedings consistent with this opinion.

_____
Alok Ahuja, Chief Judge

All concur.

---

[3]     Because the trial court found that Reno had "subjected [Gonzales] to a pattern of domestic violence," in its judgment on remand the trial court is required by § 452.375.13 to "make *specific findings of fact* to show that the custody or visitation arrangement ordered by the court best protects the . . . household member who is the victim of domestic violence[.]"  (Emphasis added.)