

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| JENNIFER ROBIN MOORE, | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD84782 |
| | ) | |
| JARED MOORE, | ) | FILED: May 17, 2022 |
| Respondent. | ) | |

**Appeal from the Circuit Court of Henry County**
**The Honorable Harold L. Dump, II, Judge**

**Before Division One: Lisa White Hardwick, P.J., and**
**Alok Ahuja and Mark D. Pfeiffer, JJ.**

Jennifer Moore ("Mother") appeals from the judgment of the Circuit Court of Henry County, which dissolved her marriage to Jared Moore ("Father"). Mother contends that the provision of the judgment awarding Father sole legal custody of the parties' two children is against the weight of the evidence. We affirm.

## Factual Background

Mother and Father married in 2016, and separated in May of 2019. They had two children during their marriage. Mother filed a petition for dissolution of the marriage in June 2019. The dissolution proceeding was tried to the court in three hearings between January and April 2021.

Father and Mother filed several parenting plans. Although the parenting plans differed concerning the parties' respective parenting time, and concerning child support arrangements, all of the parties' proposed parenting plans requested that they be awarded joint physical and joint legal custody of the children. Mother's

proposed parenting plan specified that the children would be homeschooled, and left unvaccinated, while Father's proposal provided that the children would attend public school in his residential district, and receive all required vaccinations.

Lauren Knuth served as an occupational therapist for one of the children, who had been diagnosed with autism. Knuth recommended that the child attend a public school to access special education programs in the district. Knuth also testified that the child would benefit from social interactions in the classroom.

Mother hired Rocky Lee as a private investigator to investigate Father "on and off for a six-week period." Lee testified that he placed surveillance cameras to watch Father's residence.

During his testimony, Father admitted that he had made "bad choices" with alcohol in the past, but he claimed that he did not currently have an alcohol problem. Father testified that he never drank around the children, and that he was never intoxicated during his video calls with the children while they were in Mother's custody. Father testified that Mother told him that she could get him fired from his job, and afterwards he was laid off from his job because someone wrongfully reported to his employer that Father had lost his driver's license. During two exchanges of the children, Mother called the police to report Father driving without a license, with the intent of having him arrested. During both incidents, Father waited for police to arrive, and only left with the children after proving to the responding officers that he did indeed have valid driving privileges, or a licensed driver available to transport him.

Mother testified that she believed Father was lying to her about who he had watching the children, that the children came back from his house with medical and psychological problems, and that Father was an alcoholic with an angry and depressed demeanor while drinking. Mother stated that she had found child pornography on Father's computer. Mother told the court that Father had been

abusive to the children in the past, although she did not report it. Mother admitted that she does not believe what Father tells her, and that she hired the investigator Lee to prove that Father was lying. Mother testified that she worries for the children's safety while they are staying with Father. Despite this, Mother acknowledged that she does not call or have videoconferences with the children while they are in Father's custody, even though she is entitled to that communication.

Mother testified to three separate occasions in which she took the children to the hospital immediately following a custody exchange, once for bruised fingers, another time for a 101-degree fever, and a third time when one of the children was purportedly unresponsive. On each of these occasions, Mother blamed Father, and did not communicate about the medical visits to Father. During one of the hospital visits, Mother told medical personnel that she was not going to call Father because "I do not trust him, and he will lie anyways."

Mother submitted as an exhibit a text conversation between herself and Father, which reflected that Father was identified as "Narc Asshole" in her phone. Mother admitted telling Father's boss and his employer that she believed Father was going to lose his driver's license – an exercise which the circuit court found was an attempt to have Father fired. Mother also acknowledged that she had made several posts on Facebook calling Father "filth," accusing Father of cheating on her during the marriage, and stating that she was contemplating taking out a billboard near Father's girlfriend's work place, accusing her publicly of having participated in an adulterous relationship with Father.

During her testimony, Mother was confronted with a text message exchange in which she told Father that she had secured alternative health insurance for the children, and he therefore did not need to pay the premium for insurance he had obtained. Despite this text exchange, she later filed a motion for contempt against

3

Father, in which she contended that he had cancelled the children's insurance without her knowledge. Mother claimed she had forgotten about the exchange of text messages when she filed her contempt motion.

When she was asked during trial whether she believed it would be in the children's best interest to have Father's home designated as the children's residence for educational and mailing purposes, Mother responded, "absolutely not." She explained:

> Because [Father] will not be honest with me about who's caring for the children. He's leaving them with random people. They're having a lot of issues. They're spending a week at his house. They're having medical issues, they're having psychological issues. He lives right next to a main highway with no fence.

The following colloquy occurred during Mother's testimony, concerning whether she believed she could co-parent with Father:

> Q.     Do you think you'll ever be able to trust [Father] enough to co-parent with him and communicate with him on a regular basis about your kids?
>
> A.     I would love to be able to do that. I would love to be able to do that, if he could be honest with me about what's going on with them.
>
> Q.     When has he lied to you about what's going on with them, about – with the kids?
>
> A.     He – he lies – he lies about the – every – he lies about who's watching them, he lies about whether he's going to work and leaving them at home, he lies about, you know, their injuries.

When asked whether she trusted Father "to protect [her] children in his own way," Mother responded that, "I don't trust him to make good decisions."

The guardian ad litem recommended joint legal and joint physical custody, with Father's home designated as the children's address for mailing and educational purposes. The guardian ad litem testified about his concerns regarding Mother's refusal to communicate the children's medical visits to Father, Mother's

4

willingness to take the children on the road and away from Father, and Mother's lack of video or phone contact with the children while they were in Father's care, despite her accusations that he was neglecting or abusing them. The guardian ad litem admitted that he believed the "co-parenting relationship between these parents is damaged mostly because, in my opinion as it relates to best interest of the kids, mother's inability to co-parent with the father because of prior history." In regards to Father's consumption of alcohol, the guardian ad litem testified that he did not hear "any credible evidence" that Father's consumption was a current concern; the guardian ad litem also noted that Father had been exercising shared custody of the children for an extended period of time without problems. The guardian ad litem expressed concerns about Mother's desire to leave the children unvaccinated, and have them homeschooled, despite professional recommendations to do otherwise.

On May 13, 2021, the trial court entered its Judgment of Dissolution of Marriage granting the parties joint physical custody, but awarding Father sole legal custody of the children. In discussing which parent was more likely to permit the children to have frequent, continuing and meaningful contact with the other parent, the judgment makes the following findings:

> During the pendency of this matter, Mother has acted in such a fashion as to attempt to limit the amount of time Father has with the children. She has called law enforcement to child custody exchanges claiming that Father did not have a valid driver's license, but on both occasions, it was found that Father was able to drive or had a licensed driver and was able to leave with the children. She has attempted to get Father fired from his employment by contacting his employer. She has taken the children to the hospital after child custody exchanges attempting to find something to allow her to withhold visitation from Father. Furthermore, she hired a private investigator to track Father in an attempt to find something that he did wrong.

> Mother actually submitted into evidence her Exhibit 8 wherein she has him saved in her contacts as "Narc Asshole". This behavior is

5

concerning to the Court that Mother will continue in the future to limit the contact the children have with Father.

Mother testified that she had concerns for the children while in Father's custody, but fails to utilize her ability to video chat with the children while they are in Father's care. It would appear to the Court that if Mother actually had reasonable concerns about the children's safety, then she would utilize every opportunity to check in on the children. This would include video chatting with the children when she was able.

The judgment also found that "Mother has such an extreme amount of animosity toward Father that it will make their ability to co-parent in the future difficult."

The circuit court's judgment also specifically rejected Mother's claims regarding Father's current alcohol consumption:

The Court notes that Father did admit to pushing Mother while under the influence of alcohol in a text message. This is concerning to the Court that Father can behave in an aggressive manner when consuming alcohol. Mother is rightly concerned that Father could cause harm to the children when drinking. However, Father testified that he has followed the Court's order and not consumed alcohol with the children were in his care. Mother disputes this, but was unable to submit any credible evidence to the contrary. The Court finds Father's testimony on this fact credible.

Ultimately, although the circuit court concluded that joint *physical* custody was appropriate, its judgment awards sole *legal* custody to Father, "based upon [Mother]'s behaviors and her inability to co-parent with [Father]."

Mother appeals, challenging the circuit court's award of sole legal custody to Father.

## Standard of Review

"[C]hallengers to a custody award bear a heavy burden." *White v. White*, 616 S.W.3d 373, 380 (Mo. App. W.D. 2020).

"This Court will affirm the trial court's decision as to an award of child custody unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." "The trial court has broad discretion in child custody

6

matters, and we will affirm its award of custody unless we are firmly convinced that the children's welfare requires otherwise."

*K.T.L. by Next Friend K.L. v. A.G.*, No. ED109375, 2021 WL 6121845, at *2 (Mo. App. E.D. Dec. 28, 2021) (citations omitted).

Appellate courts act with caution in exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence. [A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment. The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong. When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations. A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. When the evidence poses two reasonable but different inferences, this Court is obligated to defer to the trial court's assessment of the evidence. This Court rarely has reversed a trial judgment as against the weight of the evidence . . . .

*Bowers v. Bowers*, 543 S.W.3d 608, 615 (Mo. 2018) (quoting *S.S.S. v. C.V.S.*, 529 S.W.3d 811, 815-16 (Mo. 2017)).

## Discussion

Mother's single Point asserts that the circuit court's award of sole legal custody to Father was against the weight of the evidence.

Sections 452.375.5(1) and (2), RSMo, provide that, before awarding joint physical custody and sole legal custody to one parent, the court must consider "[j]oint physical and joint legal custody to both parents." Thus, "[t]he legislature has 'expressed a public policy preference for joint custody where such an arrangement is in the best interests of the child.'" *White*, 616 S.W.3d at 380 (citation omitted). Despite that legislative preference, however,

7

[j]oint custody is not appropriate and not in the best interest of the children when parents are unable to make shared decisions concerning the welfare of their children. The parents' ability and willingness to communicate and cooperate is crucial in considering whether joint legal custody is proper. Joint legal custody may be proper even if there is some level of personal tension and hostility between the parents, provided there is substantial evidence that despite this acrimony the parties nonetheless have the ability and willingness to fundamentally cooperate in making decisions concerning the children's upbringing.

*Id.* (citing *Morgan v. Morgan*, 497 S.W.3d 359, 373 (Mo. App. E.D. 2016)). A judgment granting sole legal custody must be based on a finding that the parties lack a commonality of beliefs concerning parental decisions, and lack the willingness and ability to function as a unit in making those decisions. *Reno v. Gonzales*, 489 S.W.3d 900, 905 (Mo. App. W.D. 2016).

In its judgment, the circuit court specifically discussed a number of factors which, in its view, justified the conclusion that Mother and Father would not be able to effectively co-parent, and which justified an award of sole legal custody to Father. Those factors included:

- o   Mother's and Father's "substantial differences in opinion about parenting and what they feel is in the best interest of their children."

- o   Mother's attempts to have Father arrested by calling law enforcement to child exchanges and falsely claiming Father did not have a driver's license.

- o   Mother's attempt to have Father fired from his job by calling Father's employer.

- o   Mother's taking the children to the hospital immediately after their visits with Father, without informing Father, to attempt to collect information to support a claim that he was abusing or neglecting the children.

- o   Mother's use of a private investigator to follow and surveil Father.

- o   Mother's listing of Father in her phone as "Narc Asshole."

- o   Mother's preference to have the children homeschooled and left unvaccinated, despite opposing recommendations from their therapist and guardian ad litem.

8

o  Mother's failure to communicate with the children while they were in Father's custody, despite her claims that she was concerned about their welfare while in his care.

With the above evidence, the trial court concluded that "Mother has such an extreme amount of animosity toward Father that it will make their ability to co-parent in the future difficult." The fact that Mother testified repeatedly that she does not trust Father, and that she believes he is consistently dishonest with her concerning the children's care and welfare, additionally supports the conclusion that Mother and Father would be unable to successfully co-parent.

In order to challenge the circuit court's award of sole legal custody to Father based on the weight of the evidence, Mother was required to "identify a challenged factual proposition, the existence of which is necessary to sustain the judgment" (here, that Father and Mother would not be able to successfully co-parent), and then "identify all of the favorable evidence in the record supporting the existence of that proposition." *Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010). Yet, although she contends that the circuit court's award of sole legal custody is against the weight of the evidence, in her argument Mother completely ignores the evidence described above, which plainly supports the circuit court's conclusion that an award of sole legal custody to Father was warranted. Mother's failure to acknowledge, and respond to, the copious evidence supporting the circuit court's judgment requires that we reject her weight-of-the-evidence challenge.

Rather than addressing the evidence supporting the circuit court's judgment, Mother contends that the circuit court ignored the Missouri public policy reflected in § 452.375.5, RSMo, which gives a preference to the award of joint legal and joint physical custody. As we have explained above, however, this statutory preference is just that – a preference. That preference is overcome where, as here, the evidence establishes that "parents are unable to make shared decisions concerning the welfare of their children." *White*, 616 S.W.3d at 380. Despite the statutory

9

preference for joint legal custody, this Court has affirmed innumerable judgments awarding sole legal custody to one parent where the evidence warranted it,[1] and we have reversed awards of joint legal custody where the evidence fails to demonstrate the parties' ability to make joint decisions in the best interests of their children. *See, e.g., Reno*, 489 S.W.3d at 903; *Halford v. Halford*, 292 S.W.3d 536, 545-46 (Mo. App. S.D. 2009); *Kroeger-Eberhart v. Eberhart*, 254 S.W.3d 38, 49 (Mo. App. E.D. 2007); *Marriage of Sutton*, 233 S.W.3d 786, 791-93 (Mo. App. E.D. 2007).

Mother cites several cases where appellate courts *affirmed* a trial court's judgment granting joint legal custody, despite evidence of an acrimonious relationship between the parents. These decisions simply reflect, however, the level of deference afforded to circuit courts in making fact-intensive custody determinations. The fact that the circuit court in this case arguably *could have* awarded the parties joint legal custody does nothing to suggest that it acted against the weight of the evidence in making a contrary custody award. This Court will not overturn a child custody award merely because the evidence may have permitted the circuit court to order a different custody arrangement.

Mother also argues that the circuit court's award of sole legal custody is against the weight of the evidence, because neither Mother nor Father, nor the guardian ad litem, proposed that Father be awarded sole legal custody. The fact that both parties proposed parenting plans providing for joint legal custody is *some evidence* from which the circuit court could have concluded that the parties would be able to co-parent, despite their past mistrust and acrimony. The parties' proposals were not binding on the court, however – and Mother cites no authority giving the

---

[1] *See, e.g., Lynch v. Lynch*, 592 S.W.3d 806, 815-16 (Mo. App. E.D. 2020); *Meseberg v. Meseberg*, 580 S.W.3d 59, 69 (Mo. App. W.D. 2019); *J.F.H. v. S.L.S.*, 550 S.W.3d 532, 540-41 (Mo. App. E.D. 2017); *Sutton v. McCollum*, 421 S.W.3d 477, 483-84 (Mo. App. S.D. 2013).

parties' proposed parenting plans dispositive weight. Section 452.375.2, RSMo, expressly provides that "[t]he court" – not the parties or the guardian ad litem – "shall determine custody in accordance with the best interests of the child." The statute provides that the court must *consider* "[t]he wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties," § 452.375.2(1) – but it does not give the parents' wishes controlling weight. Indeed, even where the parents *agree* to a custody arrangement, the statute specifies that the court need not endorse it, if the court "determines such arrangement is not in the best interest of the child." § 472.375.6. The fact that the parents may have submitted parenting plans – or even a joint parenting plan – is not dispositive; instead, the statute specifies that "in all cases, the custody plan approved and ordered by the court shall be in the court's discretion and shall be in the best interest of the child." § 452.375.9. The fact that both parties in this case were willing to propose a joint legal custody arrangement does not – by itself – establish that the award of sole legal custody was against the weight of the evidence.

## Conclusion

The judgment of the circuit court, which awarded sole legal custody of the parties' children to Father, is affirmed.

_____
Alok Ahuja, Judge

All concur.

11