

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

RON ELLIOTT IRVING,　　　　　　　　)
Individually, and I.D.A.A.,　　　　　　)
Minor Child, by Next Friend,　　　　　)
RON ELLIOTT IRVING,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Respondent,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　WD86648
　　　　　　　　　　　　　　　　　　)
JENNY ANNE ANGSTROM,　　　　　　　)　　　Filed:  November 19, 2024
　　　　　　　　　　　　　　　　　　)
　　　　Appellant.　　　　　　　　　　)

**Appeal from the Circuit Court of Boone County**
**The Honorable Jeff Harris, Judge**

**Before Division Three: Thomas N. Chapman, P.J., and**
**Lisa White Hardwick and Alok Ahuja, JJ.**

Ron Irving ("Father") filed this paternity action in the Circuit Court of Boone County, seeking to be declared the father of the minor female I.D.A.A. ("Child"). Jenny Angstrom ("Mother") is Child's natural mother. Following a bench trial, the circuit court found Father to be Child's natural father. The court awarded the parties joint physical and legal custody of Child; adopted a parenting plan which designated Father's address as Child's address for mailing and educational purposes; awarded Mother child support; and ordered that Child's surname be changed from Mother's surname to Father's. Mother appeals. She

challenges the award of joint legal custody; the order for a name change; the designation of Father's address as the address for Child for mailing and educational purposes; and the court's calculation of child support. Because the circuit court's judgment found that neither Mother nor Father had a present willingness to communicate with the other, we reverse the award of joint legal custody, and remand for further proceedings concerning Child's legal custody. We affirm the remainder of the circuit court's judgment.

**Factual Background**

Consistent with our standard of review, we recite the facts in the light most favorable to the judgment.

In late 2017, Mother placed an online advertisement seeking a sperm donor. Father responded. The parties did not sign a sperm donor agreement, and Father was not paid for his donation. Father requested at the outset that he be involved in Child's life, and Mother agreed that he would be significantly involved in Child's upbringing. Father also stated that he and Mother agreed that Child would carry his surname.

Father testified that he and Mother began what he understood to be a romantic relationship. Father attended Mother's medical appointments for several months after Mother became pregnant. Later in her pregnancy, Mother distanced herself from Father, and stopped communicating with him. She gave birth to Child in Canada. Although Father had understood that he would be permitted to attend Child's birth, Mother did not invite him to be present. She also did not list Father on Child's birth certificate, and gave Child Mother's surname.

On December 21, 2021, Father filed a Petition for Declaration of Paternity, Custody, Visitation, and Child Support Order, requesting joint legal and physical custody of Child, and requesting that his surname be added to Child's name. One month later, Father filed a motion for an emergency order of temporary custody, alleging that Mother had refused to allow him to see Child since the petition was filed, and that Mother was planning to move to North Carolina with Child. The circuit court granted Father's motion, ordered the parties to continue to exercise joint physical custody, and ordered Mother to return Child to central Missouri. On March 14, 2022, Father filed an amended petition requesting sole physical and legal custody of Child.

In October 2022, Mother notified Father that she intended to relocate herself and Child to North Carolina as of December 30, 2022, and thereafter filed a motion for reconsideration of the temporary custody order. Father opposed Mother's relocation with Child. A Guardian *ad Litem* ("GAL") was appointed on February 18, 2023.

The circuit court held a bench trial on August 17, 2023. The court issued an "Order Following Bench Trial" on August 31, 2023, stating that it intended to award joint physical and legal custody of Child to Mother and Father, and to find that moving the Child to North Carolina, as Mother requested, would not be in Child's best interest. The court's Order Following Bench Trial requested that the parties incorporate the court's intended rulings in any proposed judgments they submitted.

The court held a post-trial hearing on September 29, 2023, to hear objections to the proposed parenting plan contained in the court's Order

3

Following Bench Trial. At this hearing, the court also heard from the parties concerning matters which were not addressed at trial, including Father's request that Child's last name be changed from Mother's surname to Father's.

The circuit court issued its judgment on October 6, 2023. The judgment made findings on the child-custody factors listed in § 452.375.2,[1] and concluded that an award of joint legal and joint physical custody was in Child's best interest. The parenting plan adopted by the court awarded each parent an equal amount of parenting time, on a "week on/week off" schedule. The judgment designated Father's address as Child's address for mailing and educational purposes. The court also found that a change of Child's surname to Father's last name would be in Child's best interest. Using Form 14, the court calculated a presumed child support amount payable to Mother of $327.00 per month. The court found the presumed child support amount to be unjust and inappropriate "due to the split nature of time and expenses of the parties," and instead awarded child support to Mother of $250.00 per month.

Mother appeals. As at trial, Mother represents herself *pro se* on appeal.

## Standard of Review

We review the judgment under the standards set forth in *Murphy v. Carron*, 536 S.W.3d 30, 32 (Mo. 1976). *McLeod v. McLeod*, 681 S.W.3d 215, 228 (Mo. App. W.D. 2023). We will affirm the judgment "unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Kaderly v. Kaderly*, 656 S.W.3d 333, 338 (Mo. App. W.D. 2022) (quoting *Reichard v. Reichard*, 637 S.W.3d 559, 569 (Mo. App. W.D.

---

[1] Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2024 Cumulative Supplement.

2021)). When determining the sufficiency of the evidence, this court "will accept as true the evidence and inferences from the evidence that are favorable to the [circuit] court's decree and disregard all contrary evidence." *Wright v. Buttercase ex rel. Buttercase*, 244 S.W.3d 174, 176 (Mo. App. W.D. 2008) (quoting *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. 1989)).

## Discussion

### I.

In her first Point, Mother argues that the circuit court erred in awarding the parties joint legal custody. We agree.

"While this appeal stemmed from a paternity action, we note that Section 452.375 governs the initial award of custody in paternity cases, as well as dissolution cases." *Reno v. Gonzales*, 489 S.W.3d 900, 902 n. 2 (Mo. App. W.D. 2016) (cleaned up).

"Joint legal custody" is defined in § 452.375.1(2) to mean that "the parents share the decision-making rights, responsibilities, and authority relating to the health, education and welfare of the child, and, unless allocated, apportioned, or decreed, the parents shall confer with one another in the exercise of decision-making rights, responsibilities, and authority." "Sole legal custody" is not separately defined in the statute. "Sole legal custody, therefore, is defined by what it is not – joint." *J.W. by K.C.G. v. N.R.W.*, 695 S.W.3d 231, 249 (Mo. App. W.D. 2024). We have defined "sole legal custody" as "'[a]n arrangement by which one parent has full control and sole decision-making responsibility – to the exclusion of the other parent – on matters such as health, education, religion, and living arrangements.'" *Id.* at 248-49 (citation omitted).

5

Section 452.375.4 declares that "it is the public policy of this state to encourage parents to participate in decisions affecting the health, education and welfare of their children, and to resolve disputes involving their children amicably through alternative dispute resolution." The statute also directs the court to "determine the custody arrangement which will best assure both parents participate in such decisions . . . so long as it is in the best interests of the child." Section 452.375.5 provides that circuit courts must consider potential custodial arrangements in the following order:

> (1) Joint physical and joint legal custody to both parents . . .;

> (2) Joint physical custody with one party granted sole legal custody. . . .;

> (3) Joint legal custody with one party granted sole physical custody;

> (4) Sole custody to either parent; or

> (5) Third-party custody or visitation . . . .

While §§ 452.375.4 and .5 declare a legislative *preference* for joint legal and physical custody, the statutes "'do[ ] not create a *presumption* in favor of joint custody.'" *Reno*, 489 S.W.3d at 903 (quoting *Kroeger–Eberhart v. Eberhart*, 254 S.W.3d 38, 47 (Mo. App. E.D. 2007)). "The statutory preference for joint legal custody does not displace the paramount consideration in making child custody determinations: the best interests of the child." *Reno*, 489 S.W.3d at 902.

Section 452.375.2 lists eight non-exclusive factors which circuit courts must consider in making contested custody determinations. Although those eight factors are relevant to every legal custody determination, this Court has

repeatedly emphasized that an award of joint legal custody is not appropriate where the parties are unable to communicate with one another, and co-parent in the best interest of their child.

> "The parents' ability to communicate and cooperate is crucial in considering whether joint legal custody is proper." "[J]oint legal custody is not always or necessarily inappropriate merely because there is some level of personal tension and hostility between the former spouses." However, such custody is appropriate only if "there is substantial evidence that despite this acrimony the parties nonetheless have the ability and willingness to fundamentally cooperate in making decisions concerning their child's upbringing."

> "'If the parents are unable to make shared decisions concerning the welfare of the children, joint custody is not in the best interests of the children.'" Accordingly, "[i]f there is no substantial evidence in the record that the parties have a commonality of beliefs concerning parental decisions and the willingness and ability to function as a unit in making those decisions, a trial court's award of joint legal custody must be reversed."

*Reno*, 489 S.W.3d at 903 (citations omitted); *see also*, *e.g.*, *J.W.*, 695 S.W.3d at 247–48.

In multiple cases, we have reversed awards of joint legal custody where the evidence failed to establish that the parties had the ability to work together to jointly raise their child. Thus, in *Reno*, the circuit court's judgment itself found that "the parties had shown no commonality of beliefs concerning parental decisions and had demonstrated neither willingness nor ability to function as a unit in making these decisions." 489 S.W.3d at 903. The judgment also noted that one of the parents had repeatedly "demonstrated an unwillingness to communicate with" the other parent concerning the child. *Id.* Because "the judgment demonstrates that there was not substantial evidence to support an

7

award of joint legal custody," we reversed the award of joint legal custody. *Id.* at 905.

Similarly, the Eastern District reversed an award of joint legal custody in *In re Marriage of Sutton*, 233 S.W.3d 786 (Mo. App. E.D. 2007), where the circuit court made findings concerning "the parties' inability to interact with each other without acrimony"; their inability to make joint decisions or notify each other of decisions made; and their constant bickering and criticism of each other in front of the children. *Id.* at 792. The circuit court had also ordered that the parties communicate only by fax machine in order to reduce their conflicts. *Id.* In these circumstances, the Court found that the order of joint legal custody could not be affirmed:

> The trial court's findings and the remedies it felt compelled to order to cause the parties to change their behavior independently demonstrate a breakdown of parental cooperation and communication that was inconsistent with an award of joint legal custody. That the court ordered the parties to communicate by fax, because they could communicate no other way, not only shows a breakdown of communication, but also is not a viable means of parental communication.

*Id.* at 792-93 (citations omitted); *see also J.W.*, 695 S.W.3d at 250 (reversing award of joint legal custody; noting that circuit court's finding of "significant evidence regarding the inability of the parties to communicate effectively," and of their "inability to co-parent," "reflect that Mother and Father may be unable to make shared decisions concerning the welfare of Child, justifying an award of sole legal custody"); *Kroeger-Eberhart v. Eberhart*, 254 S.W.3d 38, 48 (Mo. App. E.D. 2007) (reversing award of joint legal custody where, "[i]n its judgment, the trial court found that the mother and father were unable to communicate to the

degree necessary to ensure that the child would not suffer from a stalemate between the parents").

In this case, the circuit court's own judgment and parenting plan establish that an award of joint legal custody was inappropriate. The circuit court stated that the following finding justified its award of joint legal custody: "To date, neither parent has demonstrated a willingness to communicate with the other parent or to involve the other parent in the child's life." Far from justifying joint legal custody, this finding establishes that such an award is _in_appropriate.

The circuit court's parenting plan likewise recognizes the parties' inability to interact or co-parent. The parenting plan stated that the court had adopted a week on, week off parenting-time schedule which minimized the number of custody exchanges, "[g]iven the inability of the parents to co-parent without disputes and the complaints from both parents regarding the behavior of the other parent during exchanges and in the child's presence at doctor appointments." The court also ordered that custody exchanges be conducted by one parent dropping off the Child at daycare or school, and the other parent picking Child up – thus eliminating the need for _any_ face-to-face interaction. Where an in-person exchange was required, the parenting plan specifies that "[t]he parents shall not discuss any custody matters or exchange any words other than short pleasantries." Although Child is on the autism spectrum, has special educational needs, and has frequent health-care and therapy appointments, the parenting plan specifies that the parents must "alternate scheduling and attending all appointments, activities, recitals, games, etc. for the minor child," and that they "shall schedule and attend separate Parent/Teacher Conferences."

The parenting plan also specifies that the parties will communicate solely through a software application designed for co-parenting.

As in *Marriage of Sutton*, "[t]he trial court's findings and the remedies it felt compelled to order to cause the parties to change their behavior independently demonstrate a breakdown of parental cooperation and communication that was inconsistent with an award of joint legal custody." 233 S.W.3d at 793. If the parties were unable to communicate constructively with one another, and were incapable of jointly attending the Child's important appointments and events – *as the circuit court found* – we fail to see how the court could conclude that the parties would be able to *jointly* make life decisions for the Child.

The evidence adduced at trial richly supports the circuit court's findings that Mother and Father were unable to communicate in a productive fashion, and that their in-person interactions needed to be minimized in the best interest of Child. Both Mother and Father requested sole legal custody, reflecting their shared belief that they were unable to work together in Child's best interest. Father testified that he was concerned that Mother was attempting to alienate him from Child (including with her proposed move to North Carolina), and that she had made all treatment decisions for Child unilaterally, despite Father's desire to be involved. Father gave examples of significant medical issues the Child faced, of which Mother did not inform him (including a broken bone, and a swallowed object which required surgical intervention). Father testified that he had asked the police to be present at custody exchanges because of Mother's aggressive behavior. Father also testified that he believed additional co-

10

parenting counseling for the parties was necessary, although he stated that "I never wanted this to get to this point," and that he had "hoped that we could have resolved the different issues that we had." When asked by Mother how well they worked together, Father responded, "[n]ot well at all, in my opinion."

For her part, Mother testified that, although the parties had been attending co-parenting counseling, "I don't see much of any progress made." When asked whether she believed she and Father could make decisions together, she responded simply, "[w]e don't talk."

The couple's co-parenting counselor characterized Mother and Father's relationship as "high-conflict." The counselor testified that Mother and Father do not speak to one another when they are with the Child, and that it would be in Child's best interest that Mother and Father minimize their interactions with one another in Child's presence. Counselor testified that she was recommending a week on/week off parenting-time schedule to minimize the parents' interactions, "because the conflict's so high." She testified that, even after several counseling sessions, Mother was still unable to identify anything of value in Child's relationship with Father; Mother also continued to question Father's paternity, despite DNA testing confirming his fatherhood. The counselor testified that Mother's unwillingness to recognize Father's paternity, and her ongoing desire to relocate to North Carolina, were "huge stumbling blocks" to a co-parenting relationship. Even once the paternity and relocation issues were resolved, counselor testified that "I don't know . . . if these two can or will develop the kind of fair and flexible co-parenting relationship that they really need. That is left to be determined."

In the face of this evidence that Mother and Father were unable to communicate or interact, the award of joint legal custody was not supported by substantial competent evidence, and must be reversed. We note that, in recommending joint legal custody, the Guardian *ad Litem* contended that Mother and Father "should be encouraged to work harder on making joint decisions and . . . on their communication process." The GAL acknowledged that her recommendation of joint legal custody was possibly "aspirational," but that it is "always a hope" that "things will improve."

To the extent the court's judgment was based on hopes similar to those expressed by the Guardian *ad Litem*, such aspirations cannot support the award of joint legal custody, without evidence that the parties are *currently* able to co-parent. As we explained in *Reno*,

> [w]hile this may be a laudable motivation, it cannot support an award of joint legal custody where there was no evidence that the parties had, in fact, been able to co-parent previously. "The preference for joint custody stated in section 452.375 does not mandate a joint custody award designed to induce parents to find common ground; rather it expresses a preference in favor of parents who show the willingness and ability to share child-rearing rights and responsibilities." *Kroeger–Eberhart*, 254 S.W.3d at 48; *see also Sutton*, 233 S.W.3d at 792 ("The trial court's orders were designed to force the parties to cooperate in order to maintain joint legal custody, a result that . . . is not contemplated by section 452.375.4."). Even if the parties had expressed aspirations to work together in the future despite their past problems (which they had not), "[t]he parties' assertions that they think they can talk, or that they hope to work together once they have a court order to do so, does not overcome the evidence of their prolonged, demonstrated inability to the contrary." *Kroeger–Eberhart*, 254 S.W.3d at 49. Without evidence of the parties' *present* ability to make joint decisions in the child's best interests, the *hope* that they might do so in the future was an insufficient basis to support the award of joint legal custody.

*Reno*, 489 S.W.3d at 905.

In this case, as in *Kroeger-Eberhart*, "[t]he trial court had the unenviable task of crafting a legal custody award" when the parents had demonstrated no ability to communicate or co-parent, and where an award of sole legal custody to _either_ parent ran the risk that the designated parent would exclude the other from any role in major decisions concerning the Child's welfare. 254 S.W.3d at 49. Nevertheless, where the parties are unable to communicate with one another to make joint decisions concerning Child's health, education and welfare, the circuit court must award sole legal custody to one parent or the other, to avoid constant disputes and stalemates.

We accordingly reverse the circuit court's award of joint legal custody to both parents, and remand to the circuit court for further proceedings concerning legal custody. "On remand, '[i]t is within the trial court's discretion to reopen the record and receive additional evidence concerning legal custody, given the passage of time since trial and judgment.'" *Reno*, 489 S.W.3d at 905 (quoting *Kroeger–Eberhart*, 254 S.W.3d at 49). In this case almost fourteen months have passed since entry of the circuit court's original judgment. If the circuit court chooses to receive additional evidence, and if that evidence shows that the situation has improved and that the parties have been able to communicate and work together since entry of the original judgment, then an award of joint legal custody may be warranted in the exercise of the circuit court's discretion. On the other hand, "[w]e emphasize that the existing record does *not* support an award of joint legal custody; therefore, if the trial court chooses not to receive additional

13

evidence concerning legal custody on remand, its authority will be limited to determining which party should be awarded sole legal custody." *Id.*

## II.

Mother's second and third Points relate to Child's name change from Mother's last name to Father's last name.

In her second Point, Mother contends that the circuit court erroneously ordered Father's surname to be substituted for her own, because Father's petition asked only that his surname be *added* to Child's name, and because she was not given adequate notice that the name-change issue would be addressed at the bench trial held on August 17, 2023. Mother did not raise any pleading issue in the circuit court, either before or after the entry of the circuit court's judgment. In addition, the name change issue was not heard during the August 17, 2023 bench trial, but was instead addressed at a subsequent hearing on September 29, 2023. When the name-change issue was discussed during the September 29 hearing, Mother made no objection that she was unaware the issue would be considered, and made no request for a continuance. "'Arguments not raised before the trial court . . . are not preserved for review on appeal because [w]e will not convict a trial court of error on an issue that was not put before the trial court to decide.'" *Stanton v. City of Skidmore*, 620 S.W.3d 245, 250 (Mo. App. W.D. 2021) (quoting *Bartsch v. BMC Farms, LLC*, 573 S.W.3d 737, 743 (Mo. App. W.D. 2019)). Because she failed to preserve any claim of lack of notice of the name-change issue, Point II is denied.

In her third Point, Mother contends that no substantial evidence supported the circuit court's order changing Child's surname to match Father's. Section

14

210.841.3(5) provides that a circuit court's judgment in a paternity action "may contain . . . provision[s] . . . concerning: . . . [a]ny matter in the best interest of the child." Section 210.841.3(5) "grant[s] authority to the circuit court to order a name change." *Jenkins v. Austin*, 255 S.W.3d 24, 26 (Mo. App. W.D. 2008) (citing *Cobb by Webb v. Cobb*, 844 S.W.2d 7, 8 (Mo. App. W.D. 1992)).

No legal presumption exists that a child born out of wedlock should bear a particular parent's surname. *Wright v. Buttercase ex rel. Buttercase*, 244 S.W.3d 174, 177-178 (Mo. App. W.D. 2008). "'Neither parent has the absolute right to confer his or her name upon the child.'" *Jenkins*, 255 S.W.3d at 27 (quoting *Brown v. Shannahan*, 141 S.W.3d 77, 82 (Mo. App. E.D. 2004)).

In determining the appropriate surname for a child born out of wedlock, the circuit court "has wide discretion and should be guided by what is in the best interests of the child." *Blechle v. Poirrier*, 110 S.W.3d 853, 855 (Mo. App. E.D. 2003) (quoting *B.L.W. by Ellen K. v. Wollweber*, 823 S.W.2d 119, 122 (Mo. App. S.D. 1992)); *see also M.R.H. v. J.N.P.*, 385 S.W.3d 494, 497 (Mo. App. E.D. 2012). The burden is on the parent seeking to change the child's surname to prove such a change is in the child's best interests. *Wright*, 244 S.W.3d at 177. The factors the circuit court should consider include "(1) the child's age, (2) the potential embarrassment or discomfort the child might experience when his or her surname is different from the custodial parent, and (3) how the name change will affect the child's relationship with his parents." *M.R.H.*, 385 S.W.3d at 498 (citing *Wright*, 244 S.W.3d at 177; additional citation omitted). In numerous cases this Court has affirmed judgments ordering a name change where a child was in their infancy, and where the evidence indicated that a name change would

15

foster the child's relationship with a parent who would be substantially involved in the child's upbringing. *See Wright*, 244 S.W.3d at 178-79; *Jenkins*, 255 S.W.3d at 28; *Cobb*, 844 S.W.2d at 9.

The circuit court had substantial evidence in this case justifying a change of Child's surname to match Father's. At the September 29, 2023 hearing, Father stated[2] that, prior to Child's birth, the parties had agreed that Child would bear Father's last name. Father explained that Mother had reneged on her agreement to give Child his surname as part of her campaign to distance him from Child. Father also explained in detail why it was important to his relationship with Child for Child to have his last name, as the parties had agreed before her birth:

> I've always wanted to take full responsibility for my daughter. I've always wanted to do that.
>
> And as far as her having my last name – this entire trial is [Mother] disavowing the fact that I was part of [Child] being born. . . . [A]s far as [Child's] name, this is just another indication that she just doesn't want anything to do – that she basically just gave birth and I wasn't involved at all. . . . I've gone through so many things in order to have [Child] to be here, and for her not to have my name is just another – it's just another indication that I wasn't involved at all.
>
> And I think that . . . that's terrible. I really do, because, you know, that's not what – that's me not being involved in my daughter's life and not having a stake in my daughter's life.
>
> . . . And this is just another way for [Mother] to try to disassociate myself from my daughter.

---

[2] Mother's Brief notes that Father's and Mother's statements at the September 29, 2023 hearing were unsworn. Mother did not object in the circuit court to the parties' unsworn statements, and does not argue for reversal because the parties' testimony concerning the name change issue was not given under oath. We do not further address the issue.

Father's detailed explanation of his reasons for wanting Child to bear his surname provides substantial evidence supporting the circuit court's order. As noted above, Missouri courts have upheld name change orders where a change to the name of a very young child would foster the child's relationship with a parent who would be significantly involved in the child's upbringing. Further, the evidence that the parties had *agreed* beforehand that Child would bear Father's surname, and that Mother was using Child's surname as a way of distancing Child from Father, provides further support for the circuit court's conclusion that changing Child's surname was in her best interest. Mother's unilateral decision to give Child a different name than the one to which both parents had previously agreed is inconsistent with the principle that "'[n]either parent has the absolute right to confer his or her name upon the child.'" *Jenkins*, 255 S.W.3d at 27 (emphasis added; citation omitted). Further, the evidence that Mother was weaponizing Child's name to express her personal animosity toward Father, and to drive a wedge between Child and her Father, supports the circuit court's action. *See Interest of C.M.V.*, 479 S.W.3d 352, 359 (Tex. App. 2015) (listing among factors a court may consider in addressing a name-change request: "whether either parent is motivated by concerns other than the child's best interest – for example, an attempt to alienate the child from the other parent").

Mother also complains that the circuit court rejected a hyphenated last name for Child, which could have reflected the surnames of both parents. The court explained, however, that it did not believe a hyphenated surname would be workable here, because the Child already had two middle names, and the use of a hyphenated surname would make Child's full name overly cumbersome, and

would create "additional logistical problems" for her. While a hyphenated surname may have recognized both sides of Child's lineage, the circuit court did not act outside its wide discretion in rejecting that alternative.

Substantial evidence supports the circuit court's order that Child's surname be changed to match Father's, and that order did not constitute an abuse of discretion. Point III is denied.

## III.

In her fourth Point, Mother argues that the circuit court erred in ordering that she receive only $250.00 per month in child support. Mother argues that the circuit court erroneously calculated the presumed child support amount using Form 14, and that the court abused its discretion in finding the presumed child support amount to be unjust and inappropriate.

> An award of child support is within the sound discretion of the trial court. An appellate court will interfere only if the trial court abused its discretion by ordering an amount that is against the logic of the circumstances or is arbitrary or unreasonable. We will not disturb a child support award unless the evidence is palpably insufficient to support it.

*Bearce v. Lewey*, 182 S.W.3d 737, 741 (Mo. App. W.D. 2006) (cleaned up).

> In determining child support, the circuit court is required to follow a two-step procedure. First, the trial court is required to calculate the child support amount pursuant to Civil Procedure Form 14, either by accepting one of the parent's Form 14 calculations or by performing its own Form 14 calculation. Second, the trial court considers whether the presumed Form 14 amount is "unjust or inappropriate" after considering all relevant factors.

*Clippard v. Clippard*, 642 S.W.3d 761, 764 (Mo. App. S.D. 2022) (cleaned up).

Section 452.340.9 and Rule 88.01(b) establish a rebuttable presumption that Form 14 correctly calculates an appropriate child support award. To rebut

this presumption, the circuit court must consider all relevant factors, and make a written finding or specific finding on the record stating that the Form 14 amount is unjust or inappropriate. § 452.340.9; Rule 88.01(b). "The trial court has broad and sound discretion in considering whether to rebut the presumed correct child support amount." *Schriner v. Edwards*, 69 S.W.3d 89, 93 (Mo. App. W.D. 2002).

With respect to the circuit court's calculation of the presumed child support amount using Form 14, Mother contends that the court erroneously excluded the work-related childcare costs of both parties; erroneously excluded uninsured medical expenses which Mother was paying; and erroneously gave Father a 50% overnight-visitation credit. Mother failed to make any of these objections in the circuit court, however. At the September 19, 2023 hearing, the circuit court reviewed the Form 14 it had prepared line-by-line with the parties, explaining what values it was including on each line. Mother did not object when the court stated that it was "zeroing out" the parties' respective childcare costs, because the parties were each exercising equal parenting time; nor did she object when the court stated that it was including no uninsured medical expenses in the calculation.

Mother *did* object to the 50% overnight-visitation credit afforded to Father; but she did so solely on the basis that the Form 14 instructions contain a table indicating that 34% is the presumptive maximum credit a payor spouse should receive for overnight parenting time. Mother did not acknowledge that the Form 14 instructions for line 11 expressly allow the court to adjust the credit from 34% "up to 50% based upon the circumstances of the parties." While

19

Mother now argues that Father was not entitled to this upward adjustment of the overnight credit because of his income level, she never made this claim to the circuit court.

Because they were not preserved in the circuit court, we reject Mother's challenges to the circuit court's Form 14 calculation.

With respect to the circuit court's rebuttal of the presumed child support amount, Mother merely cites a case holding that a child support award may be appropriate even in cases of joint physical custody. But that is not the issue here: the circuit court *ordered* Father to pay $250.00 per month in child support, *even though* the court had ordered joint physical custody. The circuit court did not wholly deny Mother child support because Father was Child's joint physical custodian. In this case, the circuit court rebutted the presumed child support amount, and awarded a smaller sum, not because the parties were exercising joint physical custody, but instead based on "the split nature of time and expenses of the parties." Mother offers no argument, or legal authority, to support the reversal of this ruling. "'If the point is one for which precedent is appropriate and available, it is the obligation of appellant to cite it if he expects to prevail.'" *Gan v. Schrock*, 652 S.W.3d 703, 710 (Mo. App. W.D. 2022) (quoting *Thummel v. King*, 570 S.W.2d 679, 687 (Mo. 1978)). "[I]t is not the role or function of this Court to assist either party in developing a party's legal arguments on appeal." *B.A. v. Ready*, 634 S.W.3d 653, 657 (Mo. App. W.D. 2021) (citation omitted).

Point IV is denied.

## IV.

In her final Point, Mother claims that the Court erred in designating Father's address as Child's address for school and mailing purposes.

Section 452.375.2(5) and (7) provide that, in selecting an appropriate custody arrangement, the circuit court may consider "[t]he child's adjustment to the child's home, school, and community," and "[t]he intention of either parent to relocate the principal residence of the child." In its judgment, the circuit court found that "[t]he child has adjusted well to her home, school and community as demonstrated by her improvement with language and her behavioral and social progress." The court also concluded that Child's "significant progress" was due to "the therapies she has received in Central Missouri," and that it would not be in Child's best interest to grant Mother's request to relocate with Child to North Carolina. Because of Mother's intention to relocate, the court found that § 452.375.2(7) favored Father. The court then stated that its "adoption of a joint legal and joint physical custody plan, along with the designation of [Father]'s home in Columbia, Missouri as the minor child's educational and mailing address, resolves the Court's concerns, and this factor therefore favors neither party."

The circuit court's designation of Father's address for educational and mailing purposes was supported by its finding that Child was well adjusted to, and thriving in, Columbia, and by the evidence that Mother had repeatedly expressed an intention to relocate with the Child to North Carolina (despite the effect the move would have on Child's existing social and therapeutic relationships, and Father's concerns that a relocation would sever his relationship with Child). *See Voinescu v. Kinkade*, 270 S.W.3d 482, 486 (Mo.

21

App. W.D. 2008) (designation of father's address as child's for educational and mailing purposes was supported by findings that child was "'well-adjusted in her home,'" and that "Mother had expressed a 'preference' for relocating" out of State).

Point V is denied.

## Conclusion

The circuit court's award of joint legal custody to the parties is reversed, and the case is remanded to the circuit court for further proceedings concerning the legal custody issue. In all other respects, the judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.

22